Jessie W. COLLINS, Appellant
(Defendant below),

v.

The STATE of Wyoming, Appellee
(Plaintiff below).

No. 4907.

Supreme Court of Wyoming.

Jan. 29, 1979.

Thomas L. Sansonetti, Gillette, and Cecil K. Hughes, Sundance, signed the brief, for appellant.

John J. Rooney, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., and Allen C. Johnson, Asst. Atty. Gen., signed the brief. Willis C. Geer, County and Prosecuting Atty., for Campbell County, appeared in oral argument on behalf of appellee.

Before RAPER, C. J., McCLINTOCK, THOMAS and ROSE, JJ., and GUTHRIE, J., Retired.*

* At the time of oral argument, Guthrie, J., was Chief Justice. He retired from the court on December 31, 1978. By order of the court, entered on January 1, 1979, he has been re-

RAPER, Chief Justice.

The defendant was charged with the first degree murders of Harry Reno and Jack Putnam. Following a trial by jury, the defendant-appellant was convicted of two counts of murder in the first degree in violation of § 6–54, W.S.1957.[1] Following the verdicts of guilty, the defendant was sentenced as to each, to imprisonment for life. He appeals asserting as errors:

1. Failure of the trial court to grant a change of venue.
2. The trial judge's order to lock the courtroom doors during oral argument.
3. Refusal of the trial judge to sequester the jury during trial.
4. Allowing two exhibits, photographs of the dead body of Jack Putnam, to be received in evidence.
5. Insufficient evidence to sustain the verdicts of guilty.

We will affirm.

At about 8:00 in the evening of a Saturday on the date of the homicides, the defendant, a 42-year-old male iron worker and his girlfriend, Gloria, 31 years of age, entered the Long Branch Bar at Reno Junction, located approximately thirty-eight miles south of Gillette. They had been on their weekly shopping trip; they shared a mobile home at Wright, two miles east of the Long Branch and had stopped for a drink before heading on home.

Some fifteen persons were in the bar at the time of the homicides which took place in their close presence. With minor variations, the testimony of those present and appearing as witnesses at the trial was remarkably consistent. Very few of the witnesses were acquainted with defendant or those killed. The events that led up to the fatalities were apparently initiated by a drunken woman who was rowdy and generally making a nuisance of herself. She attempted to sit on the defendant's lap and was running her fingers through his hair. Gloria became angered and told her to get off or she would remove her. The woman refused, and so Gloria pushed her off onto the floor. An unfriendly wrestling match between the two women ensued and went on for some time.

The two decedents were patrons of the bar and had apparently been drinking considerably, although according to testimony of the lady tending bar that evening and another, they were jovial, in a rather good mood, and not causing any problems. Both were acquaintances of the bar owner and, as a matter of fact, helped out in the establishment on occasion in gestures of friendliness. Putnam was the uncle of Reno.

Putnam went up to the defendant and, because of a fear they might hurt themselves, suggested the two women should be stopped. Defendant is reported to have said, "It's a fine argument, they will settle it among themselves, just go back and watch your drink." There is testimony that Putnam then extended an invitation to defendant to, "go for a round or two." Several of the witnesses testified the defendant said to Putnam, "You're fooling with death. I play for keeps are you ready to die?"[2] Putnam took a swing at defendant. There

---

tained in active judicial service pursuant to § 5, Art. V, Wyoming Constitution and § 5–1–106(f), W.S.1977, and has continued to participate in the decision and opinion of the court in this case.

1. § 6–54(a) and (e), W.S.1957 (§ 1, Ch. 136, S.L.Wyo.1973):

 "(a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison or causing the same to be done, kills any human being, is guilty of murder in the first degree.

 * * * * * *

"(e) Upon conviction of murder in the first degree, if the offense does not involve a course of conduct as described in subsection (b) of this section, the person convicted shall be sentenced to imprisonment for life."

See *Kennedy v. State*, Wyo.1977, 559 P.2d 1014.

2. The material that follows in quotes, attributed to defendant, is a composite taken from the testimony of witnesses present. There are differences in the testimony as to the sequence in which the statements were made, but there is general agreement that they were made in substance, as narrated.

is some variation as to whether or not defendant was actually struck. However, the stronger indication is that there was at least a glancing blow. At that moment, the defendant shot Putnam. More than one witness testified that the defendant had a cap over his hands just before he stood up and shot Putnam, indicating that the weapon was ready for use at that time.

Defendant then said to those in the bar, generally, "Does anyone else want to mess with me? Because I play for keeps if you want to play the game." One of the patrons, said by another witness to have been under a table, testified defendant said, "This is self defense." The witness responded, "They got places behind bars for people for self defense like that." The defendant wheeled around and pointed his gun at the witness and asked him what he said. The witness' response to the inquiry was silence.

About that time, Reno picked up a pool cue by the small end and, with considerable force, hit the defendant across the shoulders, shattering the cue into three parts. The defendant turned toward Reno, gun in hand. Reno was backing up with his hands up over his head and, after a pause of several seconds, the defendant shot him.

The defendant then said, "That's two," and then added, "It was self defense, you all saw that." The defendant then pointed the gun at everybody and said, "Who wants to be next? I've got bullets enough in here to kill everybody in here. Anybody else wants to stop here, just step up." The defendant then said to his friend, Gloria, "Let's get out of here," and they left.

While all of the foregoing events were taking place, the individual working at the bar that evening dialed emergency 911 and reported the shooting of Putnam. The police department dispatcher in Gillette, while taking the call, heard a noise in the background and the person on the line said, "He just shot another person." Law enforcement officers and an ambulance were dispatched to the scene. Putnam was dead when the ambulance arrived, but Reno was alive and was taken to a hospital in Gillette

where he received emergency treatment to the extent possible with local facilities available. He had been shot in the abdomen, resulting in extensive damage. He was transferred to a Denver hospital where he died. An autopsy was done and the pathologist testified through deposition that the death was the result of complications following multiple internal injuries caused by a gunshot wound.

An autopsy was done on Putnam. A pathologist testified that death was the result of a gunshot wound through the lower neck which caused massive accumulation of blood in and collapse of the left lung and severe shock. The pathologist also testified that the alcohol content of Putnam's blood was .24, which he further testified meant that Putnam was drunk at the time he was shot.

The defendant was apprehended at Casper, Wyoming at about 5:00 a. m., two days later. Following arrest, he made various statements after being regularly, on at least two occasions, given the *Miranda* warning as to his rights to remain silent. During a conversation in the Sheriff's office in Casper, defendant stated that after being beaten fourteen years ago, he started carrying a gun and swore that no one would ever beat him up again. He further advised that he shot Putnam and Reno to protect himself. He confirmed that Gloria and another girl at the bar had gotten into a fight, a man had come up, told him to leave well enough alone, and took a swing at him. He stated that he wasn't going to get beat up anymore by anybody, that he had his gun in his pocket, pulled it out after the man took a swing at him, and then shot him. He said he turned around after being hit with the pool cue and, without looking, shot the other man. The defendant gave written consent for a search of his motor vehicle, during which the murder revolver was recovered. A forensic scientist from the Wyoming crime laboratory testified that the bullets recovered from the bodies of the two deceased victims were fired from the weapon recovered in the search.

Other facts will be related during the course of this opinion as necessary.

## CHANGE OF VENUE

Defendant made a pretrial motion for a change of venue. About four months before trial, a hearing on the motion was held. At the hearing, defendant's counsel produced two witnesses. One, a twenty-three year-old bank teller in Gillette, testified that she talked to customers in the bank and she had formed an opinion that the defendant was guilty. She had known the Reno family as long as she had been around. She refused to testify with whom she had discussed the crimes nor could she recall exactly what had been said. She concluded that 100 percent of those with whom she had talked felt that he was guilty. Since the witness could not name anyone with whom she had talked, we could not determine if that person was on the jury even if we had the names of the jurors.

The other witness was the news director of a local radio station. He testified that the murders were news-worthy and that reports of the incidents and the progress of the prosecution were reported over the radio from time to time. He produced copies of newscast scripts. They were objective, indicating that a first-degree murder warrant had been issued, that the defendant was being sought after the shooting, that Putnam had been shot in the neck, that Reno had been shot in the stomach after he reportedly swung a pool cue at the gunman, and that the defendant had been apprehended at Casper. When Reno died, it was reported that an additional murder charge would be filed against the defendant. Other than the various phases of the prosecution noted above, it was also reported that a preliminary hearing had been held, that the defendant was bound over, and that a change of venue hearing was to be held. He further testified that the number of stories run in this particular case was not out of the ordinary for the crimes charged.

In addition to the testimony, the affidavits of two other persons were presented to the court. One of the affidavits indicated that the affiant had been told by somebody else that the defendant had previously committed four murders in other states but had been acquitted in each instance by claiming self defense. He further stated that he had repeated the information to a group which included one of defendant's attorneys and asked if the attorney was aware of defendant's background. There is no indication in the record that any juror was aware of any information, true or false, that defendant had committed four other murders. The second affidavit said to have been filed is that of a ranch employee who had a conversation with someone else, and he was told by that someone else that several ranchers were considering raising bond enough to release defendant in order to have an opportunity to hang him prior to trial. (This affidavit could not be found in the record, but the State does not contest the fact that it was as claimed by the defendant and considered by the district judge.) The voir dire does not disclose that any member of the jury sitting was aware of or participated in such activity. A defendant has the burden of demonstrating the bias of a juror. *Lopez v. State*, Wyo. 1976, 544 P.2d 855.

A compilation of newspaper articles was also presented for the consideration of the district court. While they are numerous, they are a collection accumulated between the time of the crimes and the time of the filing of the motion for a change of venue. An examination indicates that they are objective, give a report of what occurred, narrate the progress of the proceedings from time to time, and are of a generally informative nature. There is no editorial reporting nor any editorials containing any sort of a conclusion that the defendant was guilty. In the news items there is a report that Reno hit the defendant with a pool cue and also a report that there were words between the defendant and Putnam, prior to the shootings.

A second motion for change of venue was filed when an explosion occurred at the Long Branch Bar. The news report on that specifically stated and reported that there was no known connection between the explosion and the crime for which the defend-

ant was about to go on trial. The trial judge, following the second motion for a change of venue, reserved a decision until after voir dire[3] and indicated that if an impartial jury could not be impaneled, the change of venue would be granted. Following the voir dire, no renewal of a motion for change of venue appears nor is there an order in the record overruling the second motion. We consider the motion overruled because the trial proceeded. A review of the voir dire proceedings indicated that there was no difficulty in the selection of a jury to try the case.

Evidence of bias and prejudice in the community does not appear in the voir dire examination. The trial judge employed a system of jury selection to which the defendant made no objection. From the total panel of over one hundred present in the courtroom, thirty-two names were drawn. The first twelve went into the jury box and the remaining twenty were specially seated. The last four names called were the ones from which two alternate jurors would be selected. As one member of the panel amongst the thirty-two was excused for cause, the name of another was drawn to occupy the same seat. The part of the voir dire conducted by the State was not reported, other than a statement in the record that as a result of the State's voir dire, fifteen jurors were excused for cause. The defendant's voir dire was on the record. As a result of that voir dire, a few other members of the group of thirty-two were excused for cause at the instance of the de-

fendant. Only one juror was not excused for cause when requested by the defendant. That one juror gave vague answers to the questions asked by the defense counsel. However, he gave decisive answers to basically the same questions when asked by the court and assured the trial judge that he could serve as a fair and impartial juror. The defendant passed the panel of thirty-two for cause.

There is nothing in the record which indicates all peremptory challenges were exercised by either the State or the defendant. The record is blank from the end of the voir dire until the jurors were assembled in the courtroom to hear the court's opening instruction as to their duties and the procedural course the case would take. The names of the jurors sitting do not appear in the record.

 Except as otherwise permitted by statute or rule, a prosecution is had in the county in which the offense is charged to have been committed. Rule 21, W.R.Cr.P. Rule 23(a), W.R.Cr.P. provides for transfer:

"(a) The court upon motion of the defendant made at least 15 days prior to the date set for trial, shall transfer the proceeding as to him to another county, whether or not such county is specified in the defendant's motion, if the court is satisfied that there exists within the county where the prosecution is pending *so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county.*"[4]

---

3. Standard 8–3.3(d), American Bar Association Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press, Second Tentative Draft issued in the Summer of 1978: "If a motion for change of venue or continuance is made prior to the impaneling of the jury, the court may defer ruling until the completion of voir dire." As pointed out in the commentary to the Standard, this is a regular practice in some jurisdictions in that it presupposes that voir dire is an accurate barometer of public sentiment and assumes that failure of the defense to take full advantage of challenges for cause and peremptory challenges reflects the fact that public sentiment is not hostilely aligned against the defendant. The Standard hastens to point out, however, that the reasons

are not completely self-evident as presumptions.

4. Prior to the time that the Federal Rules of Criminal Procedure were adopted, Wyoming's statutory provision, § 3–1906, W.C.S.1945, as amended, provided for the filing of an affidavit which set forth that there is excitement or prejudice in the county against the defendant and the prosecuting attorney could traverse by his affidavit the allegations of the defendant in that regard. Provision was then made for a hearing at which both parties were required to appear and support their respective affidavits by witnesses examined orally or by affidavits. Rule 23(a), W.R.Cr.P. is Rule 21(a), F.R.Cr.P., substituting only the word "county" for the word "district".

There is no question but that the constitutional standard for fairness requires that the defendant have a panel of impartial jurors.[5]

 Under the criminal rule, in order for a change of venue to be granted, the burden is upon the defendant to show prejudice so great or general as to prevent his receiving a fair and impartial trial and the decision is within the sound discretion of the trial judge. *Jackson v. State*, Wyo. 1974, 522 P.2d 1356; *Mares v. State*, Wyo. 1972, 500 P.2d 530; *Moss v. State*, Wyo. 1972, 492 P.2d 1329. The rule states that the trial judge must be "satisfied" that great prejudice exists. He was not satisfied, nor are we satisfied that great prejudice existed and find the defendant has failed to carry his burden.

 Where newspaper articles and radio news accounts are largely factual rather than inflammatory, they cannot be considered prejudicial. *Murphy v. State of Florida*, 5th Cir. 1974, 495 F.2d 553, aff'd. 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589; *U. S. v. Schwartzenberger*, 9th Cir. 1972, 457 F.2d 380.

 The defendant passed all jurors for cause, indicating to us that each had satisfied him that the juror could render a fair and impartial verdict. In the voir dire transcript there is no colloquy upon which the defendant can base any claim of partiality against or hostility toward the defendant by a juror. Even if any juror was aware of, and could recall, the facts as reported by the news media, there is no requirement that such a person be totally ignorant of the facts and issues involved. As said in *Murphy v. Florida*, 1975, on appeal, 421 U.S. at 800, 95 S.Ct. at 2036, 44 L.Ed.2d at 595, quoting from *Irvin v. Dowd*, 1961, 366 U.S. 717, 723,. 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 756:

" ' * * * To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' "

While a juror's claim that he is impartial and can decide the case fairly does not finally take away any further claim of the defendant that he did not have a fair and impartial jury, he must demonstrate the actual existence of an opinion of guilt in the mind of the juror as will raise a presumption of partiality. Id., 421 U.S. at 800, 95 S.Ct. at 2036, 44 L.Ed.2d at 595. There must be a showing of corrupting inflammatory publicity in comparable proportions to that shown in *Irvin v. Dowd*, supra, where the rural community was given a barrage of such information as defendant's confession to twenty-four burglaries and six murders, including the one for which he was tried and his rejected offer to plead guilty to avoid the death sentence and where eight of the twelve jurors had formed an opinion of guilt before the trial started, some going so far as to say it would take evidence to overcome their belief.

Compare the publicity here to that in *Rideau v. Louisiana*, 1963, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663, where the defendant confessed to murder under police interrogation and the confession was broadcast three times in a twenty-minute film by a television station in the community where the crime took place and the trial was held. The court there did not examine the voir dire but held that, with such publicity, that procedure would be but a "hollow formality". See also, *Estes v. Texas*, 1965, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, where the press was permitted to sit within the

---

5. Section 10, Article I, Wyoming Constitution: "In all criminal prosecutions the accused shall have the right to * * * a speedy trial by an impartial jury of the county or district in which the offense is alleged to have been committed. * * * "

The Sixth Amendment to the Constitution of the United States provides that " * * * the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * *."

bar of the court and overrun it with television equipment. Or look at *Sheppard v. Maxwell*, 1966, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, where there was extremely inflammatory publicity and the courthouse was given over to the atmosphere of a carnival, leading to a conclusion that the guilt found was the verdict of a mob.

We feel compelled at this point to warn the bench and bar that § 7–11–106, W.S. 1977,[6] must not be taken too literally because the cases just cited point out that the statute has definite constitutional limitations.

In *Nebraska Press Association v. Stuart*, 1976, 427 U.S. 539, 564, 96 S.Ct. 2791, 2805, 49 L.Ed.2d 683, 700, it was pointed out that one of the safeguards against the effects of pretrial publicity is "the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court." The court's instructions here repeatedly emphasized that the case was to be decided only on the basis of the evidence, uninfluenced by "passion or prejudice against any of the parties in this case, or by public opinion or public feeling" and to "weigh the evidence". The jury was particularly admonished that it "must determine the facts from the evidence produced in court." One of the closing instructions of the trial judge was that "[y]our verdict must be founded entirely upon the evidence admitted and the law as given in these instructions."

We are unable to conclude that the defendant did not receive a fair trial before an impartial jury. The defendant failed to show that the background of and setting in which the trial was conducted was inherently prejudicial or susceptible of an inference of actual prejudice.

## CLOSURE OF COURTROOM DOORS

 We cannot find from the record that the doors to the courtroom were ever actually locked. The transcript of the trial proceedings shows no order of the court to lock the doors, nor any contemporaneous objection. It appears that objection was first made several days following trial when a motion for new trial was made. In one of the newspaper clippings offered at that time appears the following statement, "The crowd * * * was told no one would be allowed to leave the courtroom after the proceedings began until the jury retired." There is no indication as to who issued such a direction. The same news clipping states that the courtroom was only half filled during closing arguments. It is elementary that facts not in the record will not be considered on appeal. *Johnson v. State*, Wyo.1977, 562 P.2d 1294, 1298; *Elmer v. State*, Wyo.1970, 466 P.2d 375, 376.

## REFUSAL TO SEQUESTER JURY

 The trial judge did not sequester the jury during trial, but did after it was charged and retired to deliberate. Section 7–11–210, W.S.1977, directs that:

"* * * In the trial of capital cases the jury shall not be permitted to separate, after being sworn, until discharged by the court. In other felonies and misdemeanors, the separation of the jury may be permitted in the discretion of the court, until charged, after which no separation shall be allowed until discharged."

A "capital case" is one in which the death penalty may be imposed. *Hudson v. McAdory*, Miss.1972, 268 So.2d 916; *State v. Charles*, 1970, 3 Or.App. 172, 469 P.2d 792; *Commonwealth v. Warfield*, 1967, 424 Pa. 555, 227 A.2d 177. The murders in the case before us took place on January 29, 1977. There was no valid death-penalty statute in effect on that date. *Kennedy v. State*, Wyo.1977, supra footnote 1. Wyoming's latest death penalty statute, as yet untested, was not in effect until February 28, 1977. Ch. 122, Session Laws of Wyoming, 1977.

6. § 7–11–106, W.S.1977:

"In the trial of criminal cases it shall not be cause for challenge that a person called to act as a juror has formed or expressed an opinion as to the guilt or innocence of the accused from newspaper reports and rumor, or from either of them, if such person swear that he can impartially try the case according to the law and evidence notwithstanding such opinion."

At the first recess for lunch after jury selection, the court admonished the jury:

"Now, remember the Court's admonition, you are not to discuss this case among yourselves. You're not to allow any one to discuss this with you. You're not to allow anyone to discuss this matter within your presence. Remember it's your duty not to form or express any opinion until the case is submitted to you for deliberation and for your verdict.

"Once again do not listen to any news broadcast or read anything in the newspaper concerning the count [sic] of this trial, or view the television news concerning this same matter. * * * "

As a general rule, whether or not a jury should be sequestered is addressed to the sound discretion of the trial judge. Anno., Separation of Jury in Criminal Case During Trial—Modern Cases, 72 A.L.R.3d 1310. The trial judge is granted that discretion because he is an unbiased party and in a position to observe with an unjaundiced eye the entire setting in which a trial takes place. We have examined closely not only the pretrial publicity but also that published during trial. It was factual. When such publicity is not sensational nor inflammatory, there is no need to sequester the jury particularly when the jury has been cautioned not to read the newspapers, listen to the radio or watch television during the trial and there is no indication that the court's instructions were violated. *State v. Richmond*, 1975, 112 Ariz. 228, 540 P.2d 700. In the absence of a showing of prejudice, permitting separation of a jury does not vitiate a conviction. *People v. Maestas*, 1974, 187 Colo. 107, 528 P.2d 916; *United States v. Weiss*, 10th Cir. 1970, 431 F.2d 1402. Error will not be presumed. *State v. Jones*, 1976, 218 Kan. 720, 545 P.2d 323. Defendant has failed to show prejudice.

## PHOTOGRAPHS

The defendant asserts that the trial judge erred in admitting into evidence two photographs, Exhibits 25 and 26. Both photographs were admitted for the purpose of illustrating the angle at which the bullet entered Putnam's body. There was some question as to his posture when shot by the defendant. One photograph depicts the head and shoulders and the other more the head of the dead body. The remainder of the torso is covered with a white sheet. In both, a probing rod is shown protruding from the wound where it had been inserted into the body along the course taken by the bullet through his chest from the point of entry near the lower neck and left clavicle. Alongside the probe is a protractor showing the vertical and horizontal planes of bullet entry. The angles establish that the victim was leaning forward with his body turned slightly to the right of the bullet's trajectory. The photos served a probative purpose, lending perspective and understanding to the testimony given in connection with them. *Alcala v. State*, Wyo.1971, 487 P.2d 448. While photographs of dead persons are not pleasant, these were not gruesome in appearance. The trial judge denied admission into evidence another photograph, Exhibit 24, showing the same wound, without the rod and protractor. It served no useful purpose and was cumulative in the light of the other two photographs.

The question of admissibility of photographs is generally left to the discretion of the trial judge. Photographs are admissible as long as they accurately portray the subject matter, do not convey false impressions and if their probative value outweighs the possibility of undue prejudice because unduly gruesome or inflammatory. *Seyle v. State*, Wyo.1978, 584 P.2d 1081; *Alcala v. State*, supra. We find no abuse of discretion in admitting the photographs.

## SUFFICIENCY OF EVIDENCE

The defendant finally argues the evidence is insufficient to sustain the verdicts of guilty to both counts charging murder in the first degree. The standard of review as to the sufficiency of evidence followed by this court is well stated in *Harris v. State*, Wyo.1971, 487 P.2d 800:

"In passing upon the sufficiency of the evidence to support a verdict of guilty, an

appellate court will not weigh conflicting evidence nor consider the credibility of the witnesses; and it must view the evidence in a light most favorable to the prosecution and determine questions of law as to whether there is substantial evidence, direct or circumstantial, or both, which, with the reasonable inferences that may be drawn therefrom, will sustain the verdict." (Footnote omitted.) The defendant's argument is better designed for jury consumption than an appellate court's. A failure on the part of the State to prove malice and premeditation are principally urged by defendant. Malice can be presumed from use of a firearm. *Goodman v. State*, Wyo.1977, 573 P.2d 400, 414. The word "premeditated" when used in reference to first-degree murder, implies an interval, however brief, between the formation of the intent or design and the commission of the act. *State v. Riggle*, 1956, 76 Wyo. 1, 298 P.2d 349, reh. den. 76 Wyo. 63, 300 P.2d 567, cert.den. 352 U.S. 981, 77 S.Ct. 384, 1 L.Ed.2d 366; *Loy v. State*, 1919, 26 Wyo. 381, 185 P. 796. The evidence shows just such intervals of time as to both Putnam and Reno.

The facts as narrated earlier in this opinion gave the jury adequate basis to find both malice and premeditation beyond a reasonable doubt. The defendant habitually carried a firearm and had made up his mind to use it in just the circumstances that developed. Much of his premeditation had been preformed prior to the immediate occasion and it took but a moment to fully trigger the intent to kill. His spoken threats before the shootings denote premeditation.

The instructions of the court on the question of self defense were complete and proper, and the extent to which the defendant went justified the jury in finding that killing in self defense was unnecessary and the homicides were inexcusable.

Affirmed.