Gerald SMETHURST, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 87–148.

Supreme Court of Wyoming.

June 15, 1988.

Wyoming Public Defender Program, Julie D. Naylor, Appellate Counsel, Cheyenne, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Michele J. Neves, Student Intern, Cheyenne, for appellee.

Before THOMAS, CARDINE, URBIGKIT and MACY, JJ., and KAIL, District Judge.

KAIL, District Judge.

Gerald Smethurst was tried and found guilty of first degree sexual assault in violation of § 6–2–302(a)(i), W.S.1977 (June 1983 Replacement). Smethurst was sentenced to incarceration at the Wyoming State Penitentiary for a period of not less than twelve nor more than thirty years. Smethurst appeals his conviction and sentence.

Smethurst raises the following issues on appeal:

1. Whether appellant's right to trial before an impartial jury was denied.

2. Whether it was error to admit a cumulative medical report into evidence over the objection of defense counsel.

We will affirm.

### FACTS

In October of 1986, appellant and co-defendant, Jeff Doles, were incarcerated in the juvenile section of the Campbell County Detention Center. On October 30, 1986, the victim, fifteen year-old M.G., was placed in the same cell block. The three boys spent most of the afternoon watching television together.

Sometime during the early evening or late afternoon of October 30, Smethurst and Doles went into Smethurst's cell to talk. Shortly thereafter, Smethurst and Doles returned to where the victim was watching television. Doles then jumped on the victim's back and made the victim carry him up the stairs. Doles grabbed the vic-

tim's arms and held him. Smethurst and Doles then proceeded to beat the victim.

The beating lasted approximately one and one-half hours. During the course of the beating Doles forced the victim to his knees. Smethurst pulled his pants down and put his penis in the victim's mouth. Smethurst and Doles threatened to kill the victim if he reported the occurrence.

## ISSUES

During the voir dire process, a prospective juror realized that he was familiar with some of the facts of the case. The juror asked to approach the bench, where the following exchange occurred:

"[JUROR]: Judge, I've sat back there through this whole proceeding, and I—and I—and I have every intention of serving and fulfilling my responsibility here.

"However, I feel I would not be fulfilling if I didn't let you know that through the process I have remembered this case. I have remembered discussions, and I feel I am—well, I am prejudiced right now. In my judgment. And I—I don't feel I have as—I am as open because of information I know now.

"THE COURT: What—with whom did you discuss it?

"[JUROR]: Just with—just with different jailers and some of the—you know, I recognized the face as I was sitting there. I didn't recall things at first, but I remember seeing a face now in the facility.

"And I remember—things have been coming back to me as I—even as we were sitting and talking.

"THE COURT: Okay.

"Do you have any questions?

"MS. PATTON: Isn't the critical issue whether you could put aside your prior knowledge and sit as a juror only with what's presented in court? And, if you could do that, couldn't he be a juror?

"[JUROR]: Are you asking that of me, then?

"MS. PATTON: If His Honor is permitting me to.

"THE COURT: Sure.

"[JUROR]: It's—I guess that's why I came up here is because I felt that—that previous to that I wanted to make it known, you know, I sat there and did bring back—and did have the feeling of the judge of this witness—or of this defendant.

"I feel that same way I did—I would hope I could. However, there's a question in this particular case, and which, in my working closely with the jail and through its construction—

"MS. PATTON: If you were instructed by the Court only to consider evidence produced in court, could you base your decision on only that evidence?

"[JUROR]: Yeah, I feel I could make my decision only on that.

"MS. PATTON: Okay. Thank you.

"MR. SKAGGS: Okay.

"Now, the follow-up question to that is, seeing's how we're forced to look prospectively into the future and possibly sitting in the jury room, is there a possibility that, based upon your prior knowledge of this particular case, based upon your discussions, based upon your experience in the jail, is there a possibility that you could not be fair and unbiased and not follow the Judge's instructions? Is there that possibility?

"[JUROR]: Yeah, that's—that's why I came up here, questioning of myself, and I felt I'd better bring this—at least to my attention before—again, I—I feel that I could make a fair and impartial judgment of the—of what's presented if I really put aside everything that I do know prior to this point.

"MR. SKAGGS: Is there a possibility that you would not be able to put that aside?

"THE COURT: Well, let's—he's answered the question.

"[JUROR]: Yes, I would—I hope I've answered it as much as possible. I have knowledge. I am going to do my best to insulate that, to put that aside. However, I felt I needed to make it a—both of you aware.

"THE COURT: I think that's appropriate. And let me ask the question a little more neutrally than perhaps it's been put to you.

"As I—the same thing applies with respect to the newspaper accounts. As I explained to the panel, we don't want jurors who don't read the newspapers, who don't listen to the radio because they're uninformed. And probably unintelligent.

"So that's not the test of jurors. If we have those kinds of jurors, we wouldn't get anywhere.

"[JUROR]: Uh-huh.

"THE COURT: The question is whether or not, having read or heard something, you can—you can disregard it. And there's no one that can look into your mind except for you. And the real question is—and I recognize that it's prospective and that makes it difficult—but the question is, are you able to listen to the testimony offered in court and decide on that basis or have you formed a judgment now which would prevent you from doing that?

"And it's okay if you have. But you're the only one who really can answer that question.

"[JUROR]: Okay. I feel that—and I came up here to say I felt I had a—was slanted. I did have a judgment, not a hard-core judgment but a leaning sort of decision. However, I feel I could put that aside. And hear the case.

"THE COURT: Are there other questions?

"MS. PATTON: No, Your Honor.

"MR. SKAGGS: I don't have any other questions. You may be seated. I'm going to put the objection on the record.

"THE COURT: Thank you."

The court denied defendant's motion to challenge the juror for cause.

The right to an impartial jury is guaranteed by the Wyoming and United States Constitutions. U.S. Constitution, Amendment VI; Wyo. Const. Art. 1, § 10. Appellant contends he was denied this constitutional right when the trial court denied his motion to challenge the juror for cause.

The Wyoming Rules of Criminal Procedure and §§ 7–11–101 through 7–11–107, W.S.1977, addressed the procedural and substantive aspects of the voir dire process.

Appellant asserts that the prospective juror should have been dismissed for cause pursuant to § 7–11–105(a)(ii), W.S.1977, which provided:

"(a) The following is good cause for challenge to any person called as a juror in a criminal case:

" * * *

"(ii) That he has formed or expressed an opinion as to the guilt or innocence of the accused, or is biased or prejudiced for or against the accused;"

Appellant contends that merely showing a juror has knowledge of some facts of the case constitutes prejudice. The contention is not correct.

The defendant in a criminal prosecution is entitled to an impartial jury, not a sympathetic one. *Jahnke v. State*, Wyo., 682 P.2d 991, 999–1000 (1984). A corollary to that rule is that a defendant is not entitled to a jury ignorant of current events. *See, e.g., Collins v. State*, Wyo., 589 P.2d 1283, 1289 (1979).

A fact of life in a rural state is that members of a community often discuss events occurring within the community. This court has held that mere knowledge of the facts of a case does not taint a jury or prospective juror. Id. The Wyoming legislature has likewise recognized that mere knowledge of the facts of a case, whether garnered through newspaper account or rumor, is not sufficient cause for challenge if the juror can "lay aside his impression or opinion and render a verdict based on the evidence presented in court;" (7–11–106, W.S.1977) and the trial judge is satisfied regarding the juror's ability to do just that.

The foregoing is exactly the situation we have in the present case. The prospective juror had, prior to trial, discussed the case. The juror expressed concerns about his ability to be impartial. The

juror explained that the bases for his concerns were his earlier discussions.

The juror was then asked three times in three different ways by three different persons if he could lay aside his prior knowledge and render a verdict based solely upon evidence produced in court. Each time the juror answered affirmatively.

We have recognized that " 'courts put great, though not absolute faith, in the juror's statement that he will give the defendant a fair and impartial trial.' " *Summers v. State*, Wyo., 725 P.2d 1033, 1041 (1986), *affirmed on reh.* 731 P.2d 558 (1987), (quoting 2 C. Wright, *Federal Practice and Procedure*, § 383 (2d ed.1982)).

The trial judge was satisfied that the prospective juror could lay aside his prior knowledge. The trial judge is vested with a "duty to determine if any of the prospective jurors were so biased and prejudiced that they could not have rendered a fair and impartial verdict." *Gresham v. State*, Wyo., 708 P.2d 49, 56 (1985). The trial judge is afforded a fair degree of discretion in the exercise of that duty. Id. It has not been shown, nor can it be said, that the trial judge acted unreasonably in this case.

As the trial judge sagely observed:

"My experience from these kind of cases tell me that the—the voir dire process often causes people to be very, very circumspect into their affairs and doubt their own sense of judgment and fairness."

Once the mandates of § 7–11–106 are satisfied, it becomes incumbent upon the defendant to demonstrate impartiality or bias. *Lopez v. State*, Wyo., 544 P.2d 855, 862 (1976). Appellant has failed to carry his burden.

■ The second issue presented for review concerns the admittance into evidence of a medical report.

During trial, an emergency room record was admitted into evidence over appellant's objection. The basis of the objection was: " * * * on the ground and for the reasons that there are simply highlights of oral testimony and goes against the Supreme Court dictates—that doctor's case, and the name just slips me right offhand —but barring the admission of written evidence which simply highlights oral testimony and gives more—greater—weight to the reasoning of the case, gives greater weight to the testimony than would otherwise be given to the admission of the written."

The "doctor's case" referred to by appellant is *Schmunk v. State*, Wyo., 714 P.2d 724 (1986). Appellant's reliance upon *Schmunk* is misplaced.

In *Schmunk*, the issue presented on appeal was "whether several errors occurring during the course of trial, when considered together, created sufficient prejudice to deprive appellant of a fair trial." *Id.*, at 726.

One of the errors committed in *Schmunk* was allowing the jury, during deliberations, to view a highly prejudicial videotape. We noted in *Schmunk* that videotaped testimony is *unique*, and that videotaped testimony possesses the danger of unduly emphasizing testimony. *Id.*, at 732.

The emergency room record does not carry with it the same potential for prejudice. There is no showing that the record would unduly emphasize the treating doctor's testimony. There is no showing that the record was filed or made by the treating doctor. The exhibit tended only to corroborate the testimony of the doctor.

The trial court has broad discretion with respect to admissibility of evidence. The burden is upon the appellant to show that the trial court abused its discretion by admitting the evidence. *See, e.g., Carey v. State*, Wyo., 715 P.2d 244, 247–248, *cert. denied* —— U.S. ——, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986), and authorities cited therein. Additionally, the appellant must show a reasonable possibility that the verdict might have been more favorable to him if the evidence had been excluded. *Ramirez v. State*, Wyo., 739 P.2d 1214, 1220 (1987) (citing *Bishop v. State*, Wyo., 687 P.2d 242 (1984), *cert. denied* 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985)). Appellant has failed to meet these requirements.

Affirmed.

URBIGKIT and MACY, JJ., each filed a dissenting opinion.

URBIGKIT, Justice, dissenting.

It is axiomatic in trial standards that due process is not provided if eleven appropriate jurors and one prejudicially informed witness can be seated as the constitutional twelve provided to determine guilt. In this case where that could have occurred and, to a degree, did occur, I dissent.

Juror Swanhorst was a deputy county engineer and, in that professional responsibility, was familiar with the county jail where this offense occurred. Additionally, because of the county's potential liability for the injuries sustained by the victim in this occurrence, he was, by employment, directly related to the county's monetary interest in conviction result. This case does not end there in the required search for the fair, disinterested and impartial juror. In voir dire, he admitted discussion of the case as then creating the requirement that to serve as a juror he *would* set aside knowledge that he had obtained from talking directly to jailers at the institution.

To extrapolate what he said on voir dire about knowledge and opinion derived from discussion and involvement, we learn:

"In my capacity as deputy county engineer, I was in the jail several times during the past year. I was aware of several cases that went on. I did discuss in a—I mean, you know—you know, casual manner with some of the people that work there.

"I can't say that I know this case in particular at this time. However, I'm—I'm thinking that, as it progresses, I may recall some things.

"I guess I just wanted to make everybody aware of that now.

\*    \*    \*    \*    \*    \*

"THE COURT: Okay.

"Do you feel that your knowledge about the—the jail and the operations in the jail would prevent you from being a fair and impartial juror, listening to the evidence presented, and deciding on that basis?

"MR. SWANHORST: Yes. I don't know what evidence might be presented, but I—again, working closely in the jail in my capacity, I did find out a lot of things about the operations of the jail, and I don't know if that information would be presented now or not.

\*    \*    \*    \*    \*    \*

"THE COURT: Let me ask one other question.

"There may be some civil litigation against the County and the sheriff's office over this. And I assume that you're aware of that.

"Would that in any way affect your ability to sit on the jury in this case, the fact that there may be some civil litigation arising?"

That potentiality for civil liability against the county was also explained to the jury by the prosecution:

"As you know, this is a criminal action to determine whether the proof is that the defendant is guilty or whether it fails to prove him guilty.

"There—in some cases where crimes occur in jails, there might be a companion civil action, for example, for money damages."

Then, as outlined in majority opinion, the juror announced at bench conference:

"MR. SWANHORST: Judge, I've sat back there through this whole proceeding, and I—and I—and I have every intention of serving and fulfilling my responsibility here.

"However, I feel I would not be fulfilling if I didn't let you know that through the process I have remembered this case. I have remembered discussions, and I feel I am—well, I am prejudiced right now. In my judgment. And I—I don't feel I have as—I am as open because of information I know now.

"THE COURT: What—with whom did you discuss it?

"MR. SWANHORST: Just with—just with different jailers and some of the—you know, I recognized the face as I was sitting there. I didn't recall things at first, but I remember seeing a face now in the facility.

\*    \*    \*    \*    \*    \*

"MR. SKAGGS: Okay.

"Now, the follow-up question to that is, seeing's how we're forced to look prospectively into the future and possibly sitting in the jury room, is there a possibility that, based upon your prior knowledge of this particular case, based upon your discussions, based upon your experience in the jail, is there a possibility that you could not be fair and unbiased and not follow the Judge's instructions? Is there that possibility?

"MR. SWANHORST: Yeah, that's—that's why I came up here, questioning myself, and I felt I'd better bring this—at least to my attention before—again, I—I feel that I could make a fair and impartial judgment of the—of what's presented if I really put aside everything that I do know prior to this point.

"MR. SKAGGS: Is there a possibility that you would not be able to put that aside?

"THE COURT: Well, let's—he's answered the question.

"MR. SWANHORST: Yes, I would—I hope I've answered it as much as possible. I have knowledge. I am going to do my best to insulate that, to put that aside. However, I felt I needed to make it a—both of you aware.

"THE COURT: I think that's appropriate. And let me ask the question a little more neutrally than perhaps it's been put to you.

"As I—the same thing applies with respect to the newspaper accounts. As I explained to the panel, we don't want jurors who don't read the newspapers, who don't listen to the radio because they're uninformed. And probably unintelligent.

"So that's not the test of jurors. If we have those kind of jurors, we wouldn't get anywhere.

"MR. SWANHORST: Uh-huh.

\* \* \* \* \* \*

"MR. SWANHORST: Okay. I feel that —and I came up here to say I felt I had a—was slanted. I did have a judgment, not a hard-core judgment but a leaning sort of decision. However, I feel I could put that aside. And hear the case."

*Here is a county employee who is professionally familiar with the county jail, has discussed the case with participants, who as county employees could be witnesses, and is himself not without prejudicial opinion about the events from which the criminal charge arose.*

The justice-delivery system does not have to start with jurors who arrive with both personal and direct hearsay knowledge of the events, as then asserting in regard to initial prejudice as "not a hard-core judgment, but a leaning sort of decision," and that then, as the judge observes, it "could happen" that he would carry some prejudice into the jury box. The enormity of the sacrifice of constitutional rights in present justification of expediency is denied by a vast volume of well-reasoned cases in review of constitutional application of the fair and disinterested juror within which I might not number either *Hopkinson v. State,* Wyo., 632 P.2d 79 (1981), *cert. denied* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed. 2d 463 (1982), or *Jahnke v. State,* Wyo., 682 P.2d 991 (1984) as final authority.

Judge Selya of the Court of Appeals, First Circuit in *Neron v. Tierney,* 841 F.2d 1197 (1st Cir.1988), with comprehensive consideration and interesting language, recently considered the fairness and impartiality of a trial juror who was designated in discussion as the "ex-inamorata" or "erstwhile infatuate" of defendant's son.

He first discerned:

"The Due Process Clause guarantees a criminal defendant that his trial will 'comport with prevailing notions of fundamental fairness.' *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). The right to trial by jury in a criminal case is an important feature of the justice system. In turn, the value of the right consists principally in the neutrality of the venire. All would agree that an impartial jury is an integral component of a fair trial. *See Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 551, 96 S.Ct. 2791, 2799, 49 L.Ed.2d 683 (1976). To preserve the integrity of the process, trial courts must jealously safeguard jurors' impartiality.

"The ways of due process, however, cannot be lifted intact from some handy manual. '(D)ue process is flexible and calls for such procedural protections as the particular situation demands.' *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Rather than being taken off the rack, the strictures which the Clause imposes must be tailored to fit each particular situation. *See Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). And within a given situation, a broad range of alternatives, each different from the others, may suffice to alleviate due process concerns. Because of this fluidity, cross-typing the bloodlines of a particular case with the imperatives of due process is necessarily a sui generis exercise. * * *

"These precepts have clear pertinence to the matter at hand. We have no doubt that a court must satisfactorily probe nonfrivolous charges of jury spoilage. * * * But, though adequate inquiry must be made into allegations of this genre, *see, e.g., United States v. Richman*, 600 F.2d 286, 295 (1st Cir.1979) (juror misconduct); *United States v. Corbin*, 590 F.2d 398, 400 (1st Cir.1979) (juror bias), 'adequacy' is itself a dynamic concept; the technique for achieving 'adequacy' need not always be the same." *Id.* at 1200, 1201.

In approving the state proceedings, the federal jurist observed:

"The judge sua sponte released from service each juror who indicated the remotest connection to the defendant or any witness, or who presented the tiniest reason for placing his or her neutrality in doubt. All in all, the rigor and thoroughness of the voir dire furnished a highly efficacious method of minimizing the risk of juror partiality.

*        *        *        *        *        *

"The record, we think, reflects that the trier exhibited commendable solicitude for the accused's right to trial by an impartial jury." *Id.* at 1202.

Differing from his evaluation of the juror in that case, I would find the situation here much more closely aligned to:

"There are at one extreme situations where the evidence shows the well to be so heavily poisoned that the inference of taint is inescapable; in such straitened circumstances, interrogating the juror would be an exercise in superfluity." *Id.* at 1202–1203.

As compared with:

"On the other hand, there are situations where the evidence of impropriety may be so slight or conjectural as not to support any reasonable inference of prejudicial bias or misconduct." *Id.* at 1203.

The trespass on the constitutional rights of Smethurst in denied due process did not end here. With mandated last peremptory challenge used for the exclusion of Swanhorst, defendant was forced to retain among the final array as a group to be fair and impartial, a juror, whose realistic background for appropriateness to serve in this case of contended jail misconduct arising from hardcore adult instigation, was seven years experience as a correction officer in the military prison at Fort Leavenworth, Kansas. Cynically, this juror assisted in establishing his disinterest and fairness by stating, "I think some of my prior experience would be to an advantage." This "experience" included testimony and hearings involving internal investigations of inmate problems while working in the Kansas prison. *Fair, unbiased and disinterested*? This juror also became an expert witness as placed in the jury box no matter what his conscious intent to be fair might be.

This status compares with the reasoning of the prosecution as explaining a peremptory challenge of a Hispanic venireperson that "the State always gets rid of people who have been acquittal jurors in criminal cases in the past." The relevance of this peremptory exclusion by the state while the defendant was required to retain an ex-Leavenworth, Kansas military prison guard hardly accommodates equal justice.

The population of Campbell County, as the sixth or seventh largest in the state

and the first richest in natural resources, can surely support twelve disinterested and unbiased jurors to serve on the criminal panel. To say otherwise is demeaning nonsense when applied to that industry-oriented, progressively-directed community. Nor does this meet the test of *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). *See King v. Lynaugh,* 828 F.2d 257 (5th Cir.1987).

The constitutional parameters of both the United States and Wyoming Constitutions are to guarantee to every defendant a fair trial before an impartial jury. *Taylor v. State,* Wyo., 612 P.2d 851 (1980).[1] The events of this case are revolting in cruelty of jail inmates and tragically unsatisfactory in institutional supervision. Those disturbances do not amend nor delete constitutional rights which encompass the essence of an enlightened society. Constitutional rights in the selection of the Smethurst jury were denied and I respectfully dissent.

MACY, Justice, dissenting.

I dissent. Mr. Swanhorst, one of the prospective jurors, advised the court three times that he was prejudiced, and the court talked him out of it. The test is not whether he will change his mind after hearing the evidence but whether he is biased and prejudiced before hearing the evidence. Although it is not clear whether the prospective juror was biased or prejudiced for or against the accused, neither the State nor an accused should have the burden of changing a juror's opinion as to whether the accused is guilty or innocent.

---

1. As a confirmed psychological fact, casual exposure of the jury to community publicity and newspaper reports, cf. *Collins v. State,* Wyo., 589 P.2d 1283 (1979), cannot be compared in preeminence for potentialities to convict derived from juror personal knowledge and familiarity of the facts from acquaintanceship and discussion with the participants. The experienced trial attorney's paranoia about a key man or one member-controlled jury is significantly derived from the recognition that the processes of reasoning utilize all attained knowledge. It cannot be expected that the more informed member will be restrained from sharing his or her inside information as a particularized factor in jury discussion and ultimate conclusion. Leaving Swanhorst to serve, after denied challenge for cause, presented the dilemma to defendant of either trial by eleven jurors and a prejudiced witness or effectively having his number of statutorily available peremptory challenges reduced by one to then retain for the jail event charged crime, an ex-prison guard.