**Walter GRESHAM, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 84–305.**

Supreme Court of Wyoming.

Oct. 25, 1985.

Leonard D. Munker, Public Defender, and Martin J. McClain, Appellate Counsel, Wyoming Public Defender Program, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John W. Renneisen, Senior Asst. Atty. Gen., and Thomas A. Maurer, Asst. Atty. Gen., for appellee.

Before THOMAS, C.J., and ROSE, ROONEY, BROWN and CARDINE, JJ.

ROONEY, Justice.

This appeal is from a judgment and sentence rendered after a jury trial in which appellant was found guilty of the crime of incest in violation of § 6-4-402, W.S.1977. The only issue on appeal is whether or not the trial court properly handled the voir dire process. Specifically, appellant contends that the court's questions and comments to the jurors during the voir dire prevented the selection of fair-minded jurors.

We affirm.

The jury consisted of twelve people and one alternate. Each side had eight peremptory challenges, and fifteen of the sixteen peremptory challenges were used. The appellant did not object at any time to the manner in which the voir dire was conducted or to the judge's rulings on challenges for cause. Appellant refers to the judge's questions and comments during the voir dire examination of five prospective jurors to sustain his contention that such prevented the selection of fair and impartial jurors. Four of these five were taken off the jury by peremptory challenges and the other was excused by the judge for cause. Only two of the five were challenged for cause,

both times by the appellee and not the appellant.

Because of the nature of the issue here presented, and although quite lengthy, we set forth the questions and comments of the court in context which form the grounds for appellant's contention. Mr. Helling and Mr. Bath were the prosecuting attorneys and Mr. McKinney was defense counsel.

1. Prospective juror Sanchez said that he knew appellant as a neighbor.

"MR. HELLING: Do you think that would cause you to be biased one way or the other in this case?

"MR. SANCHEZ: I think it would, sir.

"MR. HELLING: Okay. Do you think it would be fairer, say, if you served on another jury in—where—

"MR. SANCHEZ: Yeah, I would rather serve on another jury.

"MR. HELLING: And you believe you are biased?

"MR. SANCHEZ: Yeah.

"MR. HELLING: Your Honor, I would move for Mr. Sanchez's exclusion at this time.

"THE COURT: Mr. Sanchez, just because you're his neighbor, does that mean you couldn't be fair?

"MR. SANCHEZ: I guess I could be. I guess I could be fair.

"THE COURT: You're to judge it on the evidence you hear in this courtroom, ignoring the fact that he's your neighbor. You're here to try to do justice, not to be for or against your neighbor.

"MR. SANCHEZ: Well, I'm not against him or for him.

"THE COURT: All right, then, do you think you could be fair?

"MR. SANCHEZ: Yes, I do.

\*    \*    \*    \*    \*    \*

"MR. MCKINNEY: * * * Mr. Sanchez, in response to a question asked of you by the Prosecutor, you indicated that you are a neighbor and you felt that might bother you. Now, my question goes to this extent. The panel in entirety has been asked if they know any of the facts

of this case. But, I presume as a neighbor, that you have had the opportunity to view members of the Gresham family, being a neighbor. Now, do you, being a neighbor, feel that you can receive the evidence as presented from that chair, and not supply any evidence of your own observations? Do you feel that you can sit and not do that?

"MR. SANCHEZ: I think I could."

2. Prospective juror Renz said that he knew appellant and his brother "through work."

"MR. HELLING: Through work. Do you think that you could be fair and impartial?

"MR. RENZ: I don't know.

"MR. HELLING: You don't know? What problem would you have?

"MR. RENZ: That I know him would probably—along with his brother would probably have—I don't know.

"THE COURT: Mr. Renz, I'm going to ask you the same question I asked Mr. Sanchez. Just the fact that you know him, don't you think you could sit here and listen to the evidence in the case and decide it fairly? That's all we're asking you to do.

"MR. RENZ: Yeah, I probably could.

"THE COURT: All right.

\* \* \* \* \* \*

"MR. HELLING: Is there anything else that anyone here feels that should be brought out at this time as to a reason why they would be unable to serve on the jury because of some type of physical problem or some type of bias that has not been inquired into at this point?

"MR. RENZ: I'm having one problem of hearing. I was hoping the sound would be better here than what it was back there. Some of your words are not clear, and even the Judge's words, I have a hard time making his out.

"MR. HELLING: Do you feel that there would be a good possibility that you might miss some of the testimony, then?

"MR. RENZ: I'm concerned about it, yes.

"MR. HELLING: Would you like to be excused at this time?

"MR. RENZ: Pardon me?

"MR. HELLING: Would you like to be excused as a result of your hearing?

"MR. RENZ: I think it would only be fair to everybody that I would be excused because of my hearing.

"THE COURT: You seem to be hearing okay to me, Mr. —

"MR. RENZ: Well, like I said, there are words that I think I hear right, then maybe I don't. Now, yes, I would like to serve on the jury.

"THE COURT: You may serve. I think you're hearing all right."

3. Prospective juror McGrew indicated that she was acquainted with Gordon Grant, a contemplated witness.

"MR. HELLING: And how do you know Mr. Grant?

"MRS. MCGREW: He's been a friend of ours through the church for years, and he worked with us through DPASS.

"MR. HELLING: Okay. If his name were to come up or if he were to eventually testify as a witness, would you be biased one way or another concerning his testimony?

"MRS. MCGREW: I'd tend to believe him, yes.

"MR. HELLING: Okay. Do you think that it would be fair for you to sit on this jury, if Mr. Grant did appear as a witness? Or do you think that you would be biased towards Mr. Grant?

"MRS. MCGREW: I probably would be biased towards him.

"THE COURT: Mrs. McGrew, Mr. Grant is not on trial; he's not the Plaintiff; he's just a witness. Don't you think you could listen to the witnesses fairly and impartially without favoring one witness over another?

"MRS. MCGREW: I probably could. I'd have to hear them.

"THE COURT: That's the whole idea. That's why you're here, to hear it.

"MRS. MCGREW: I just would believe Mr. Grant.

"THE COURT: No matter what he said, you'd believe him?

"MRS. MCGREW: No, because—

"THE COURT: All right. Now, wait a minute, that's the point I'm getting at. Supposing everything—the testimony of everybody else was just opposite to Mr. Grant's, would you still believe him?

"MRS. MCGREW: I don't know.

"THE COURT: Then you think you could be fair?

"MRS. MCGREW: Yes.

"THE COURT: And listen to the evidence?

"MRS. MCGREW: I believe so.

"THE COURT: All right.

\*　　\*　　\*　　\*　　\*　　\*

"MR. HELLING: Is there anyone here that feels that they would not be able to sit fairly and impartially on an incest case? Yes, Mrs. McGraw?

"MRS. MCGREW: McGrew.

"MR. HELLING: McGrew, I'm sorry. Do you feel that you would be biased one way or the other?

"MRS. MCGREW: Yes, I do.

"THE COURT: Mrs. McGrew, the man is only charged with incest. They've got to prove he's guilty of it. Don't you think you could listen to the evidence and decide whether he's guilty or not? Is—the mere fact that a charge has been made doesn't mean anything. Do you understand that?

"MRS. MCGREW: I do.

"THE COURT: Well, don't you think you could sit and listen to the evidence?

"MRS. MCGREW: Yes, I could do that.

"THE COURT: All right.

\*　　\*　　\*　　\*　　\*　　\*

"MR. MCKINNEY: \* \* \* I notice, Mrs. McGrew, that you started to raise your hand concerning a question that Mr. Helling, the Prosecutor, had asked. But, apparently he didn't see you. I think it was a question pertaining to being a victim of a crime. And my question would be, simply, along the lines that the Court and Mr. Helling have asked. If you, or close friends, or family have been a victim of a crime, in your own personal opinion, do you feel that you can still—even though this is a criminal trial—receive the evidence from that chair and not be swayed by the fact that you or members of your family have suffered under a crime, not be swayed by that and still judge those facts impartially; do you feel that you can do that?

"MRS. MCGREW: Yes, I do."

4. The court did not question prospective juror Wilson or make any comment to him. The following was presented in appellant's brief to demonstrate "the participant's fear of angering the judge by contending that a juror might be biased." A comment characterized by appellee as "mere speculation."

"MR. HELLING: Mr. Wilson, you heard all the questions that were asked, have you?

"MR. WILSON: Yes.

"MR. HELLING: Did you know any of the people that were mentioned?

"MR. WILSON: No.

"MR. HELLING: I note on your questionnaire that you thought that you might not be able to serve because your job is too confining?

"MR. WILSON: Yes, it is.

"MR. HELLING: Could you explain that?

"MR. WILSON: I'm on call twenty-four hours a day, and any time I got a rig having any problems I've got to be there.

"MR. HELLING: Okay. Would that have any affect on your ability to be fair and impartial?

"MR. WILSON: Well, no, but I just—I'm awful busy.

"MR. HELLING: Would it have an affect on your ability to pay attention?

"MR. WILSON: Oh, no.

"MR. HELLING: I also note on your questionnaire, I believe you indicated that you had some type of prejudice.

"MR. WILSON: Yes, sir, I do.

"MR. HELLING: Could I ask what that prejudice is?

"MR. WILSON: Well—

"MR. HELLING: Okay, I'll withdraw that. I'll just ask if your prejudice would have any effect on this case or your ability to—

"MR. WILSON: It probably wouldn't, no.

"MR. HELLING: Your Honor, I pass this juror for cause.

"MR. MCKINNEY: Mr. Wilson, you've been with Norton Drilling Company for quite a while, haven't you?

"MR. WILSON: Yes, sir.

"MR. MCKINNEY: Our firm has represented Norton Drilling in various things, in various matters, and I don't even know, do we have an attorney/client relationship going right now?

"MR. WILSON: No, sir.

"MR. MCKINNEY: Maybe I ought to ask this because you're kind of under oath, do you owe us any money?

"MR. WILSON: No.

"MR. MCKINNEY: I got to try. We pass for cause, Your Honor."

5. Prospective juror Pivik was the last of the five prospective jurors referred to by appellant to be examined.

"MR. HELLING: Miss Pivik, have you heard the questions that have been asked here today?

"MISS PIVIK: Yes.

"MR. HELLING: Is there any of those questions which you would have an affirmative answer to?

"MISS PIVIK: Well, I'd like to be excused from this one.

"MR. HELLING: Why is that?

"MISS PIVIK: Mr. Gresham works out at the plant, and a lot of times when his supervisor isn't there, I supervise Mr. Gresham.

"MR. HELLING: Do you think that that would cause you to be baised?

"MISS PIVIK: Yes.

"MR. HELLING: Do you think if the Judge were to instruct you as to the law, to instruct you to just view this case based on the evidence presented, that you would be able to do that?

"MISS PIVIK: (Shaking head)

"MR. HELLING: Your Honor, I would ask that Miss Pivik be excused.

"THE COURT: Miss Pivik, you've been associated with law enforcement for a long time; isn't that true?

"MISS PIVIK: Uh-huh.

"THE COURT: You understand that the rules of law are that a man is presumed to be innocent until he's proven guilty, you understand that, don't you?

"MISS PIVIK: Yes.

"THE COURT: Don't you think you could listen to the evidence and decide fairly and impartially whether or not he's guilty or not? That's all there is to it.

"MISS PIVIK: I think it would be quite hard.

"THE COURT: Well, maybe it would be hard, but could you do it?

"MISS PIVIK: I don't think so.

"THE COURT: In view of your association with law enforcement all of these years, didn't you learn what the law was?

"MISS PIVIK: Yes.

"THE COURT: Yet you feel you couldn't be fair at all?

"MISS PIVIK: Not in this one.

"THE COURT: Is your mind that closed?

"MISS PIVIK: I would say.

"THE COURT: If you were the Defendant, would you want someone like you sitting as a juror in your case?

"MR. BATH: Your Honor, I think she kind of indicated that perhaps—

"THE COURT: What?

"MR. BATH: I think she's kind of indicated that already with the answers to your questions that she doesn't want to sit on this case.

"THE COURT: Well, I know. Maybe nobody wants to sit on it.

"MR. BATH: Well, I realize that.

"THE COURT: But, we're trying to find out if she can sit fairly.

"MISS PIVIK: Would be hard.

"MR. BATH: I think she's gone beyond the reasons that most of them would

have. I don't know what it might be, but we would ask that you excuse her.

"THE COURT: You may speak, Mr. McKinney.

"MR. MCKINNEY: May I have voir dire briefly, Your Honor?

"THE COURT: Yes.

"MR. MCKINNEY: Mrs. Pivik, I'm sure you know, as we do, this is our business, the attorneys. This is where we work. But I'm sure you know that we're working at two hundred and seven years of development of the law. And our law in this country is set out to provide that any person who's charged with a crime is entitled to a judgment of the facts by a jury of his peers. And you are, as determined by our jury selection system, one of Walter Gresham's peers. Now, I realize that sometimes it is very uncomfortable to think that we might be sitting in judgment on someone that we know. Even someone we work with. But, we also know that to preserve our system of law that we must maintain the system as it's set up. And that is a jury that is composed of peers of the individual. Knowing that it's difficult, that it's difficult to judge the facts as received from that chair, still in all, you do understand that the law will be given to you. I mean this two hundred and seven years of the development of the law will be embodied in the instructions given to you by the Court. You'll be able to receive those instructions clearly, won't you? I mean, you would have no argument with the law as given to you?

"MISS PIVIK: No.

"MR. MCKINNEY: Okay. So, it would be fair to say that your problem might be just in judging the facts as given by the various witnesses? It would make you uncomfortable; is that correct?

"MISS PIVIK: Right.

"MR. MCKINNEY: We often have to do uncomfortable things, don't we?

"MISS PIVIK: Yes.

"MR. MCKINNEY: This is one of them?

"MISS PIVIK: Right.

"MR. MCKINNEY: All right. But, it's not a matter of whether you're unable to, isn't it fair to say that? You're not unable to do that?

"MISS PIVIK: No.

"MR. MCKINNEY: It's just uncomfortable to do it?

"MISS PIVIK: (Nodding head)

"MR. MCKINNEY: Well, knowing that in your lifetime thus far, having handled a number of difficult things, all we're asking you to do is to handle another difficult thing. It doesn't make you a bad person. In fact, it might make you a better person. Now, just stop and think a minute. You can handle a difficult job like this, an uncomfortable one? You figure yourself as a fair person, don't you?

"MISS PIVIK: Right.

"MR. MCKINNEY: And knowing that you're doing a difficult job you can still be fair in a difficult position, can't you?

"MISS PIVIK: I think this would be rather hard.

"MR. MCKINNEY: I think it would be hard. It would be hard. It would be hard for me to defend my brother because I have emotional ties to him. But, by golly, I'd do it. If I had to do it, I'd do it. Mr. Gresham is not your brother, is he?

"MISS PIVIK: Nope.

"MR. MCKINNEY: He's a fellow employee?

"MISS PIVIK: Right.

"MR. MCKINNEY: But, it wouldn't be impossible to do this job, would it?

"MISS PIVIK: It probably would, because I know Peggy, too.

"MR. MCKINNEY: Well, by impossible, do you mean impossibly difficult for you to live with yourself or impossible to judge the facts as they're given?

"MISS PIVIK: Judge the facts.

"MR. MCKINNEY: Impossible to judge the facts?

"MISS PIVIK: Uh-huh.

"THE COURT: I can't understand people like you, Miss Pivik, particularly with

your knowledge of the law and your association with the law for so many years in Rock Springs. You're excused for cause."

Although this last comment was unnecessary, it is not, in itself, sufficient to constitute reversible error in this case. Subsequent to the examination of Miss Pivik, thirteen prospective jurors were called to the box and examined. Eight of them were challenged peremptorily, and the other five became members of the jury.

█ To prevail in this appeal, appellant must establish the alleged errors of the trial court to be plain error [1], this because there was no objection at trial and the trial court did not have an opportunity to rule on the contention. Appellant has the burden to establish the plain error. The rule will be applied sparingly and only in special circumstances. *Cutbirth v. State*, Wyo., 663 P.2d 888 (1983); *Scheikofsky v. State*, Wyo., 636 P.2d 1107 (1981); *Bradley v. State*, Wyo., 635 P.2d 1161 (1981); *Hopkinson v. State*, 632 P.2d 79 (1981), *cert. denied* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *Ketcham v. State*, Wyo., 618 P.2d 1356 (1980); *Campbell v. State*, Wyo., 589 P.2d 358 (1979); *Leeper v. State*, Wyo., 589 P.2d 379 (1979); *Johnson v. State*, Wyo., 562 P.2d 1294 (1977). We have set up a three-part test to determine whether or not plain error occurred.

"In order for an alleged error to fall within this doctrine, specific minimum criteria must be met. It must be clear from the record, without resort to speculation or equivocal reference, exactly what occurred at trial. The proponent of the doctrine must demonstrate the existence of a clear and unequivocal rule of law; and the particular facts of the case must clearly and obviously, not just arguably, transgress that rule. Finally, once these criteria have been met, it must be shown that some substantial right of the accused has been adversely affected. These criteria apply even when constitutional error is alleged; and unless each one of them is satisfied, any claim for review under the plain-error doctrine must fail. *Hampton v. State*, Wyo., 558 P.2d 504, 507–508." *Daellenbach v. State*, Wyo., 562 P.2d 679, 681 (1977).

We have applied this test on a number of occasions, e.g., *Munden v. State*, Wyo., 698 P.2d 621 (1985); *Marshall v. State*, Wyo., 646 P.2d 795 (1982); *Britton v. State*, Wyo., 643 P.2d 935 (1982); *Browder v. State*, Wyo., 639 P.2d 889 (1982); *Bradley v. State*, supra; *Settle v. State*, Wyo., 619 P.2d 387 (1980); *Ketcham v. State*, supra; *Madrid v. State*, Wyo., 592 P.2d 709 (1979).

The first requirement is here met. Exactly that which occurred at trial about which appellant complains is contained in the lengthy quotations, supra. However, appellant has not referred us to a clear or unequivocal rule of law here violated, and it follows that the violation of such rule has not been established. Appellant acknowledges the fact that the voir dire process is left to the discretion of the court. *Hopkinson v. State*, supra, 632 P.2d at 111; *Jahnke v. State*, Wyo., 682 P.2d 991, 999 (1984); *Gerard v. State*, Wyo., 511 P.2d 99, 100, *cert. denied* 414 U.S. 1072, 94 S.Ct. 585, 38 L.Ed.2d 478 (1973). He contends this discretion has been abused in that the court would not acknowledge the presence of bias and prejudice on the part of some of the prospective jurors. It must here be emphasized that none of the five prospective jurors allegedly expressing such bias and prejudice sat on this case. The third requirement for plain error (adverse effect of a substantial right) was therefore missing insofar as none of those five prospective jurors participated in this case. The contention that the questions and comments of the judge to those jurors had an effect on the answers of the other prospective jurors subsequently examined is not supported ·by any facts—certainly not "clearly and obviously" so supported.

---

1. Rule 49(b), W.R.Cr.P., and Rule 7.05, W.R. A.P., each provide:

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

■ The purpose of voir dire enunciation is to raise *alleged* bias "from the realm of speculation to the realm of fact." It is designed to inquire of the prospective jurors as to their prejudices and biases which would interfere with their duty to decide the case fairly and, thus, to explore possible grounds for challenge for cause under state statutes. *Hopkinson v. State*, supra; *Lopez v. State*, Wyo., 544 P.2d 855 (1976). The trial judge had a duty to determine if any of the prospective jurors were so biased and prejudiced that they could not have rendered a fair and impartial verdict. He had the duty to ascertain whether or not an expressed position by a prospective juror—bias or prejudice or otherwise—was made with full understanding of the context of the position in the scenario of a jury trial. It is not error for a judge to take steps to make a prospective juror understand that a supposed bias, say against red hair, will not be grounds for successful challenge for cause if the prospective juror is able to consider the case only on the evidence presented in court under the law as instructed by the court, all without reference to the color of the hair of the defendant, the prosecuting attorney or the defense attorney.

"The parties, or their attorneys, may conduct the examination of prospective jurors, but such examination shall be under the supervision and control of the court, and the court may itself conduct such further examination as it deems proper." Rule 25(a), W.R.Cr.P.

The judge's questions in this instance were directed toward the end of determining whether or not prospective jurors were so biased and prejudiced that they could not render a fair and impartial verdict based on the evidence produced at trial.

It is difficult to find plain error in a discretionary ruling of the trial court. *Munden v. State*, supra; *Bradley v. State*, supra. In *Martinez v. State*, Wyo., 611 P.2d 831, 838 (1980), we said:

"A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did. An abuse of discretion has been said to mean an error of law committed by the court under the circumstances. [Citations.] * * *."

In *Jahnke v. State*, supra, we said at page 999 of 682 P.2d:

"* * * The only inhibition regarding the discretion of the trial court is that it must be exercised subject to the essential demands of fairness. [Citation.] In deference to the discretion of the trial court, appellate courts have not been inclined to prescribe rigid rules with respect to the conduct of voir dire examinations. [Citations.] It is the trial court which assumes primary responsibility for the selection of jurors who will be able to follow its instructions on the law and evaluate the evidence without bias or prejudice to either side, and it is necessary as a pragmatic proposition to rely upon discretion of the trial court in performing that task. As the Supreme Court said in *Rosales-Lopez v. United States*, supra, 451 U.S. at 188, 101 S.Ct. at 1634:

" 'Despite its importance, the adequacy of *voir dire* is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions. See *Ristaino v. Ross*, 424 U.S. 589, 595, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976), quoting *Rideau v. Louisiana*, 373 U.S. 723, 733, 83 S.Ct. 1417, 1422, 10 L.Ed.2d 663 (1963) (Clark, J., dissenting). In neither instance can an appellate court easily second-guess the conclusions of the decision-maker who heard and observed the witnesses.' " (Emphasis in original.)

■ Appellant has not carried the required burden to establish that the trial

court could not reasonably conclude other than that his questions were proper and were directed only to ascertain whether or not the prospective juror could act only on the evidence presented in court, or that the trial court acted beyond the bounds of reason in its attempt to explain to prospective jurors that which was necessary to them to give a fair and impartial consideration to the case. He has not referred us to the existence of a "clear and unequivocal" rule of law which was transgressed "clearly and obviously, not just arguably," nor has he referred us to a "substantial right" of his which "has been adversely affected." See quotation from *Daellenbach v. State*, supra. Again, we note that such is necessary for appellant to sustain his position on appeal inasmuch as no objection was made to the voir dire at trial.

Affirmed.

ROSE, J., files a dissenting opinion.

CARDINE, J., files a concurring opinion.

ROSE, Justice, dissenting.

Because the comments and questions by the district court during the voir-dire process infringed upon appellant's constitutional right to a trial by a fair and impartial jury, I would have reversed the conviction in this case and remanded for a new trial.

Communication through voir dire lies at the heart of our system of trial by jury:

"It is upon the delicate inquiry process called voir dire that the American jury system rests, because it is through this procedure that impartial jurors are disclosed and fair trials are insured. Voir

dire means 'to speak the truth,' and the American jury voir dire has evolved as that intricate process where courts and trial lawyers inquire and communicate delicately and often personally with citizens who are called for jury duty in order that the trial's truth-seeking exercise can proceed and the bias and prejudice which we all have may be revealed and examined." *Patterson v. State*, Wyo., 691 P.2d 253, 261 (1984) (ROSE, J., specially concurring in the result only).

When the voir-dire procedure penalizes open and honest responses from venire persons, no meaningful exploration of biases and prejudices can occur, and the right of the accused to a fair trial is thwarted.

As the majority discuss, appellant seeks reversal of his conviction under the plain-error rule, since he raised no objection at trial to the court's conduct during voir dire. I have no difficulty finding that the error alleged by appellant satisfies the criteria established by this court for application of the plain-error doctrine. *Bradley v. State*, Wyo., 635 P.2d 1161, 1164 (1981);[1] *Daellenbach v. State*, Wyo., 562 P.2d 679, 681 (1977).

### Clear Rule of Law

The Sixth Amendment to the Constitution of the United States[2] and Art. 1, § 10 of the Wyoming Constitution[3] guarantee the accused in a criminal proceeding a trial by an impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *Collins v. State*, Wyo., 589 P.2d 1283, 1289 (1979). We said in *Lapp v.*

1. *Bradley v. State* establishes a three-part test for determining whether an error rises to the level of plain error:
    " * * * First, the record must be clear as to the incident which is alleged as error. Second, the party claiming that the error amounted to plain error must demonstrate that a clear and unequivocal rule of law was violated. Finally, that party must prove that a substantial right has been denied him and as a result he has been materially prejudiced." 635 P.2d at 1164.

2. The Sixth Amendment to the United States Constitution provides in part:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed * * *."

3. Article 1, § 10 of the Wyoming Constitution provides in part:

"In all criminal prosecutions the accused shall have the right * * * to a speedy trial by an impartial jury of the county or district in which the offense is alleged to have been committed."

*City of Worland,* Wyo., 612 P.2d 868, 873 (1980):

> " * * * The *essential elements* of a trial by jury are that there be *impartial jurors,* who unanimously decide the facts in controversy under the direction of a judge. [Citation.]" (Emphasis added.)

Voir dire is the procedure through which courts determine whether a juror is qualified and can reasonably be expected to be fair and impartial. *Swain v. State of Alabama,* 380 U.S. 202, 220–221, 85 S.Ct. 824, 836, 13 L.Ed.2d 759 (1965); *Vivion v. Brittain,* Wyo., 510 P.2d 21, 24 (1973); Rule 25, W.R.Cr.P.;[4] § 7–11–105(a)(ii), W.S.1977.[5] This court recently discussed the function of voir dire in *Jahnke v. State,* Wyo., 682 P.2d 991, 999 (1984):

> "* * * Voir dire examination is designed to insure the right to a fair and impartial jury by affording the parties the opportunity to discover potential prejudices and biases which would interfere with the ability of potential jurors to fairly decide the case, and the preservation of that right to prove actual bias is an integral portion of the right of a defendant to an impartial jury. [Citations.] Of the statutory grounds for challenge for cause with respect to prospective jurors in a criminal case the most significant well may be 'bias or prejudice for or against the accused.' Section 7–11–105(a)(ii), W.S.1977."

While the trial court has broad discretion concerning the questioning of prospective jurors during voir dire, this discretion must be exercised subject to the essential demands of fairness. *Aldridge v. United States,* 283 U.S. 308, 310, 51 S.Ct. 470, 471,

75 L.Ed. 1054, 73 A.L.R. 1203 (1931); *Jahnke v. State,* supra, 682 P.2d at 999. The direction and manner of inquiry on voir dire cannot undermine the objective of ferreting out partiality and bias. *Aldridge v. United States,* supra. Thus, the clear rule of law at issue in the case at bar is the right of the accused to a trial by an impartial jury, which right is secured by a fair and meaningful voir dire.

### *Violation of the Rule of Law*

During voir dire in the instant case, the court posed questions and made comments similar to the following example, whenever a prospective juror revealed his or her biases concerning the defendant, the witnesses, or the charged offense:

> "* * * [D]on't you think you could sit here and listen to the evidence in the case and decide it fairly? That's all we're asking you to do."

This line of inquiry eventually elicited a positive response from everyone admitting to a bias except Miss Pivik. When she adhered to her position that her working relationship with the accused precluded her service as an impartial juror, the court said:

> " * * * * I can't understand people like you, Miss Pivik, particularly with your knowledge of the law and your association with the law for so many years in Rock Springs. You're excused for cause."

In my judgment, this manner of conducting voir dire chilled effective communication with the panel and foreclosed the possibility of appellant's obtaining a fair and impartial jury.

---

4. Rule 25(a) and (b), W.R.Cr.P., authorizes the voir-dire process and peremptory challenges:

   "(a) *Examination of jurors.*—The parties, or their attorneys, may conduct the examination of prospective jurors, but such examination shall be under the supervision and control of the court, and the court may itself conduct such further examination as it deems proper. * * *

   "(b) *Peremptory challenges.*—* * * If the offense charged is punishable by imprisonment for more than one (1) year, each defendant shall be entitled to 8 peremptory challenges. * * *"

5. If voir dire reveals that a prospective juror is prejudiced, he may be dismissed for cause pursuant to § 7–11–105(a)(ii), W.S.1977, which provides:

   "(a) The following shall be good cause for challenge to any person called as a juror on any indictment:

   *      *      *      *      *      *

   "(ii) That he has formed or expressed an opinion as to the guilt or innocence of the accused, or is biased or prejudiced for or against the accused; * * *"

As discussed above, the purpose of voir dire is to search out prejudices and other factors which prevent any member of the panel from rendering a fair and impartial verdict. *Jahnke v. State*, supra. This purpose will be frustrated if questions and comments by officers of the court effectively instruct venirepersons to conceal their biases and avoid displeasing the court. When prospective jurors are subjected to ridicule or harassment for admitting to their prejudices, waiting members of the panel quickly learn which answers will avoid such treatment. Furthermore, an attitude of exasperation on the part of the court may convince prospective jurors that their concerns are unimportant or a waste of time.

When even one juror fails to disclose a bias based on an out-of-court relationship with the accused, a fair trial is impossible. In *State v. Salas*, 68 Or.App. 68, 680 P.2d 706, 708 (1984), the Oregon Court of Appeals recognized this concept in granting a defendant a new trial because of juror misconduct:

" * * * [F]or a juror to fail to disclose her bias against a defendant stemming from out-of-court knowledge would turn a purportedly fair trial into a 'futile forum.' *Clark v. United States*, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993, 998 (1932). In order to preserve the integrity of the jury system a defendant should be tried by a jury that does not include anyone who, at the outset, harbors serious doubts about his credibility on the basis of undisclosed out-of-court familiarity with him."

In the case at bar, the questions and comments of the trial court (set out in detail in the majority opinion) closed rather than opened the channels of communication. The court's conduct, therefore, prevented the meaningful voir dire that is guaranteed by statute, rule and decision and that is essential to the constitutionally required fair and impartial jury.

### Denial of a Substantial Right

Subsequent to the trial court's expressed disapproval of Miss Pivik's responses to voir dire, 13 prospective jurors were called and briefly examined by counsel. Not one of these persons suggested that he or she held any biases that would bear on the case. Four persons denied having any prejudice or bias of any nature whatsoever. Given the conduct of the court during the voir-dire process, the responses of these prospective jurors are not surprising.

While we cannot know with certainty that one or more of these individuals harbored feelings and opinions inconsistent with a fair trial, neither can we say that none of the jurors held such biases. Appellant in this situation was denied the meaningful exercise of his peremptory challenges as well as his challenges for cause. Accordingly, the voir-dire process failed to serve its intended purpose of insuring appellant a trial before unbiased and unprejudiced jurors.

The comments of the Washington Supreme Court in *State v. Parnell*, 77 Wash.2d 503, 463 P.2d 134, 137 (1969), are pertinent to the case at bar:

" * * * [M]ore important than speedy justice is the recognition that every defendant is entitled to a fair trial before 12 unprejudiced and unbiased jurors. Not only should there be a fair trial, but there should be no lingering doubt about it."

I would have remanded for a new trial conducted in accordance with the constitutional mandates of fairness.

CARDINE, Justice, concurring.

I would join Justice Rose in his dissenting opinion had an appropriate objection preserved the claimed error in the voir dire process. I do not believe that plain error applies in this case; and, for that reason, I concur in the opinion of the court.