# THE SUPREME COURT, STATE OF WYOMING

# 2026 WY 55

**APRIL TERM, A.D. 2026**

**May 18, 2025**

BYRON W. PINEGAR, JR.,

Appellant
(Defendant),

v.

S-25-0112

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Uinta County*
*The Honorable James C. Kaste, Judge*

*Representing Appellant:*
> Office of Public Defender: Patricia L. Bennett, State Public Defender;* Kirk A. Morgan, Chief Appellate Counsel. Argument by Mr. Morgan.

*Representing Appellee:*
> Keith G. Kautz, Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; John J. Woykovsky, Senior Assistant Attorney General. Argument by Mr. Woykovsky.

*\*An Order Substituting Patricia Bennett for Brandon Booth was entered on April 15, 2026.*

*Before BOOMGAARDEN, C.J., and GRAY, FENN, and JAROSH, JJ., and EAMES, DJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FENN, Justice.**

[¶1]   Byron W. Pinegar, Jr., was convicted of making a terroristic threat and stalking his probation officer.  On appeal, he contends the trial judge committed judicial misconduct during voir dire by making comments to a prospective juror about a stated bias.  He argues the trial judge's comments to the prospective juror, made in the presence of the entire jury panel, undermined the truth-seeking function of voir dire and deprived him of his right to a fair and impartial jury.  Mr. Pinegar also challenges the sufficiency of the evidence supporting his terroristic threat conviction.  He contends the evidence is insufficient to support he recklessly disregarded the risk that his threats would cause the evacuation of a building as required under Wyoming Statute § 6-2-505 (2021).  We affirm.

## ISSUES

[¶2]   Mr. Pinegar presents two issues on appeal, which we restate as follows:

I.   Did the trial judge commit judicial misconduct when he inquired into the bias of a prospective juror during voir dire?

II.   Was there sufficient evidence to find Mr. Pinegar acted in reckless disregard of the risk of causing the evacuation of a building in violation of Wyoming Statute § 6-2-505?

## FACTS

[¶3]   In 2010, Mr. Pinegar was placed on intensive supervised probation with a Probation Officer[1] in the Evanston field office of the Wyoming Department of Corrections' Probation and Parole Division.  As part of his intensive supervised probation, Mr. Pinegar was restricted from contacting certain individuals, including a former girlfriend who was the victim of his crime.  The Probation Officer supervised Mr. Pinegar for eleven months, while he completed the intensive supervised probation program.  Mr. Pinegar was then transferred to another officer in the same field office and remained under the supervision of that officer until he was successfully discharged from probation.

[¶4]   Almost ten years after Mr. Pinegar completed intensive supervised probation, he began text messaging the Probation Officer's work phone daily.  In those messages, Mr. Pinegar generally stated the Probation Officer stole his former girlfriend and ruined his life.  Because of the nature of the communications, the Probation Officer eventually blocked Mr. Pinegar's number.  Almost a year later, on November 5, 2022, Mr. Pinegar

---

[1] We refer to this same probation officer from 2010 as "Probation Officer" throughout the entirety of this opinion.

called 911. During that phone call, Mr. Pinegar made threatening statements toward the Probation Officer and stated the Probation Officer "gave [Mr. Pinegar's] fiancée to [his] stepdad [and] it created a f****** war here[.]" After Mr. Pinegar stated he needed to speak with the Probation Officer, dispatch asked whether he would like dispatch to make contact with the Probation Officer and request a return call. Mr. Pinegar indicated that he wanted dispatch to contact the Probation Officer. Mr. Pinegar proceeded to complain the Probation Officer had not allowed him to be with his former girlfriend while on probation. At the end of the phone call, Mr. Pinegar stated he was "going to fold up [his] police officer uniform, [his] vest, and [his] army helmet with night vision goggles and put it in the corner[.]" Although Mr. Pinegar is not law enforcement, he indicated he hoped he did not have to put those items on and use them. When the Probation Officer learned of Mr. Pinegar's phone call to dispatch from a sheriff's deputy, he reviewed the police report and listened to the recorded 911 call.

[¶5] Less than one month after calling 911, Mr. Pinegar appeared at the probation and parole office and walked past the exterior windows. When Mr. Pinegar was outside the Probation Officer's window, he made a hand gesture towards the Probation Officer. Mr. Pinegar's hand gesture was in the shape of a gun. Specifically, Mr. Pinegar had one finger pointed forward, the other fingers closed in his palm and a thumb sticking out. Concerned by this incident, the Probation Officer left the office for the rest of the day. His office manager told him to report the incident to law enforcement.

[¶6] Following the hand gesture incident, the Probation Officer unblocked Mr. Pinegar's number from his work phone. Almost immediately, the Probation Officer began receiving text messages from Mr. Pinegar. The nature of these messages continued to be the same, with Mr. Pinegar claiming the Probation Officer had ruined his life by taking his girlfriend and warning the Probation Officer would "pay for it." On December 14, 2022, Mr. Pinegar texted the Probation Officer's work phone at 6:35 a.m. and stated "[Probation Officer] I'm going to kill you sir" and "It will only be fair to take your wife. That way you can live with what you did." At 9:32 a.m., when the Probation Officer is normally at work, Mr. Pinegar sent the message "I should get my pistols and go see you right . . . now[.]"

[¶7] Mr. Pinegar sent approximately 65 messages to the Probation Officer's work phone. Due to the threatening nature of the messages, the office secretary locked the front door to secure the probation office. The Probation Officer notified the office supervisor about the messages, and she instructed him to close the office and send all staff home.

[¶8] The State charged Mr. Pinegar with two counts: Count 1, felony terroristic threats in violation of Wyoming Statute § 6-2-505 (2021); and Count 2, misdemeanor stalking in violation of Wyoming Statute 6-2-506(b)(v) (2021). A jury trial was held on December 5, 2024, and the jury returned a verdict of guilty on both counts. The district court sentenced Mr. Pinegar to 32 to 36 months of confinement for making terroristic threats and 162 to 180 days for stalking, with both counts to run consecutively. Mr. Pinegar timely appealed.

**DISCUSSION**

[¶9]    Mr. Pinegar argues the trial judge committed misconduct during voir dire by making remarks to a prospective juror that he alleges had a chilling effect on the jury panel and violated his right to a fair and impartial jury.  He also contends the evidence is insufficient to support his conviction for making a terroristic threat.  We address each argument in turn.

## I.   *The trial judge did not commit misconduct when he inquired into the asserted bias of a prospective juror during voir dire.*

[¶10]  Mr. Pinegar first challenges the trial judge's remarks to a prospective juror made during voir dire in front of the jury pool.  He argues the judge committed misconduct by publicly ridiculing the juror for answering questions truthfully and expressing a bias.  He suggests the exchange between the judge and potential juror had "a chilling effect on the jury's ability to respond affirmatively to questions asked during voir dire" and "served only to impede the truth-seeking function of voir dire."  He argues this impacted his "ability to sufficiently probe the biases and qualification of the panel and thereby denied his right to an impartial jury."

[¶11]  In support of his argument, Mr. Pinegar points to the following exchange with the prospective juror:

> [Prosecuting Attorney]:  . . . . One of the things that I've run into over the course of the last 20 years or so here in Uinta County is that we've had, at times, jurors who, because of religious beliefs or otherwise, just have a profound belief that they should not stand in judgment of anyone else.  It has nothing to do with our juror system.  It's just a belief that they shouldn't render a verdict because that is for a different power or a different service.  And so, does anybody have a core guttural belief, whether it's for any side, whether for the State or the Defendant, that you could not render a verdict if you were called to do so? [Prospective Juror?]
>
> [Prospective Juror]:  I don't want to judge anybody for any reason.
>
> [Prosecuting Attorney]:  Okay.  And so, in relation to that, knowing that the foundation - - and I'm not trying to pick on you - - the foundation of the entire court system is related to the fact that we do have to call on people to render those

verdicts - - and thank you for acknowledging that - - can you set aside that guttural belief and core belief?

[Prospective Juror]: No. It's kind of like my daughter-in-law says, not my monkeys, not my circus. Let them be responsible for their choices. I don't want to be responsible to make their choice for them. Let them do it.

[Prosecuting Attorney]: And the reason I ask is because that has resulted in us not having a result in a case in the past. Is that such a profound belief that you would - -

[Prospective Juror]: Yep.

[Prosecuting Attorney]: Your Honor, I would ask that [Prospective Juror] be - -

[The Court]: So, let me get this straight. If you were selected to serve on a jury and you went back in that room, you would refuse to make a decision?

[Prospective Juror]: Uh-huh.

[The Court]: Regardless of it being your civic duty and regardless of me instructing you on what your duty is, you just wouldn't do it?

[Prospective Juror]: No. It's not my place. That's God's place.

[The Court]: Well, I'm pretty sure it says something about rendering unto God that which is His, and rendering unto Ceasar that which is his. This is Ceasar's place, right, and we have to judge and we have to evaluate and we have to make decisions. And you're telling me that despite the fact that I will instruct you what your duty is, you won't do it.

[Prospective Juror]: Huh-uh.

[The Court]: You can leave.

[Prospective Juror]: Thank you.

4

[The Court]: Anybody else who will not do their duty? Thank you.

[¶12] When reviewing claims of judicial misconduct on appeal, this Court's role "is 'not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid,' but whether the judge's behavior was so prejudicial that it denied a defendant a fair trial." *Fernandez v. State*, 2007 WY 198, ¶ 12, 172 P.3d 730, 733–34 (Wyo. 2007) (quoting *Belden v. State*, 2003 WY 89, ¶ 9, 73 P.3d 1041, 1050 (Wyo. 2003)). Allegations of judicial misconduct during voir dire are "decided on the particular facts and circumstances surrounding such alleged misconduct[,]" and a new trial is warranted if it "affirmatively appear[s] that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party." *Langley v. State*, 2020 WY 135, ¶ 8, 474 P.3d 1130, 1132 (Wyo. 2020) (quoting *Belden*, ¶ 7, 73 P.3d at 1048–49).

[¶13] Mr. Pinegar relies on two cases to support his argument the trial judge committed misconduct when questioning the prospective juror, *U.S. v. Rowe*, 106 F.3d 1226 (5th Cir. 1997), and *Azucena v. State*, 448 P.3d 534 (Nev. 2019). The State argues both cases are distinguishable. We agree with the State and find the trial judge's conduct in this case is not comparable to the conduct of either of the judges in *Rowe* or *Azucena*.

[¶14] In *Rowe*, the Fifth Circuit Court of Appeals concluded the trial court abused its discretion in conducting voir dire because the judge's actions "cut off the vital flow of information" during voir dire from potential jurors by sending a clear message jurors would be punished "for responding in the affirmative to questions about bias." 106 F.3d at 1229–30. The trial court in *Rowe* began voir dire by issuing an arrest warrant for a prospective juror who failed to appear in front of the entire jury panel and stated to the panel: "Now, aren't you all [members of the panel] glad you appeared?" *Id.* at 1228 (alteration in original). Following this exchange, a juror expressed an inability to be impartial, and the court accused her of "refusing" to put aside her personal opinions and "clearly" making up her answer "for the occasion." *Id.* Although the court excused the juror, it ordered the juror to serve three consecutive months of jury service and stated the juror would "be coming back again, and again, and again" to "see if [she could] figure out how to put aside [her] personal opinions and do her duty to [her] country as a citizen." *Id.* The court then asked whether any other panel members had relatives or friends in law enforcement which would interfere with their ability to be fair and impartial. *Id.* A second juror explained she had beliefs that would prevent her from being fair and impartial, and although she "knew [she] was going to get [herself] into trouble" by explaining her bias, she felt that if a law enforcement agency has done enough work, then it knows what it is talking about. *Id.* In front of the entire panel the court stated:

> It is appalling, actually, that you would come into a court, and
> presume that people were guilty because they were standing

5

here charged with a crime. That's not our system. And apparently you will not, or you cannot follow the instructions of the court, so you're excused. Put her back on the jury panel for February, March and April, and perhaps you can take [sic] some remedial constitutional inquiries in the meantime.

*Id.* (alteration in the original).

[¶15]   In *Azucena*, the Nevada Supreme Court found the trial judge committed misconduct in his statements and conduct with perspective jurors which warranted reversal because the court "may have discouraged other prospective jurors from responding honestly about their own biases out of fear of repercussions." 448 P.3d at 537–39.  The court found "the judge created an atmosphere of intimidation and did nothing to alleviate the impact of his behavior," so the misconduct warranted reversal because the court could not "be confident . . . an impartial jury was selected." *Id.* at 539.  The defendant in *Azucena* was charged with multiple sex offenses against children. *Id.* at 536.  One prospective juror stated she did not think she could be unbiased because of her exposure to child abuse in her work as a nurse. *Id.*  During the trial judge's questioning of the juror, the judge threw a book against the wall and yelled at the prospective juror: "You're going to completely throw out our entire justice system because you don't want to be fair and impartial." *Id.*  The trial judge further admonished the juror and accused the juror of fabricating an excuse to get out of jury service (or in the judge's own words, "thinking up s*** and try[ing] to make s*** up"). *Id.* at 536–38.

[¶16]   Unlike the trial judges in *Rowe* and *Azucena*, the judge here did not admonish the prospective juror for disclosing a bias.  Instead, the judge inquired into whether the juror could set aside her bias and render a fair and impartial verdict.  While it is arguable the judge could have more carefully phrased his comments, the judge had an obligation to inquire into the potential bias before excusing the juror for cause.

[¶17]   "The only purpose of [voir dire] is to select a panel of jurors who will fairly and impartially hear the evidence and render a just verdict." W.R.Cr.P. 24(c)(1) (2024).  Voir dire "is designed to inquire of the prospective jurors as to their prejudices and biases which would interfere with their duty to decide the case fairly and . . . to explore possible grounds for challenge for cause under state statutes." *Gresham v. State*, 708 P.2d 49, 56 (Wyo. 1985) (citations omitted).  Rule 24(c) of the Wyoming Rules of Criminal Procedure (W.R.Cr.P.) mandates voir dire is "under the supervision and control of the judge, and the judge may conduct such further examination as the judge deems proper." W.R.Cr.P. 24(c). The judge has "an affirmative duty . . . to see that a jury of competent, fair and impartial persons is empaneled." *Summers v. State*, 725 P.2d 1033, 1037 (Wyo. 1986), *aff'd on reh'g*, 731 P.2d 558 (Wyo. 1987) (citing *Redwine v. Fitzhugh*, 329 P.2d 257[, 260] (1958)).  This duty extends to determining "if any of the prospective jurors were so biased and prejudiced that they could not have rendered a fair and impartial verdict." *Id.* at 1039 (quoting

*Gresham*, 708 P.2d at 56). In discharging this duty, it is "not error for a judge to take steps to make a prospective juror understand that a supposed bias, . . . will not be grounds for [a] successful challenge for cause if the prospective juror is able to consider the case only on the evidence presented in court under the law as instructed by the court[.]" *Id.* (quoting *Gresham*, 708 P.2d at 56).

[¶18] Because W.R.Cr.P. 24(c) places the voir dire examination under the supervision of the trial court, deference is afforded to the trial court. *Id.* (citing *Hopkinson v. State*, 632 P.2d 79[, 111] (1981)). "A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances." *Gresham*, 708 P.2d at 56 (Wyo. 1985) (quoting *Martinez v. State*, 611 P.2d 831, 838 (Wyo. 1980)). The burden is upon Mr. Pinegar to establish the trial court abused its discretion in conducting the examination of the prospective juror. *Id*. at 55–57; *Summers*, 725 P.2d at 1039.

[¶19] In *Summers v. State*, the defendant argued "the trial judge interjected himself into the voir dire examination of the jury panel in such a way that potential members of the jury were intimidated and became afraid to express their true feelings or the facts demonstrating their bias." 725 P.2d at 1035. The defendant based this claim on exchanges the judge had with two prospective jurors. *Id.* at 1038–39. One juror gave inconsistent answers about his ability to remain impartial due to prior knowledge of the defendant and was ultimately dismissed for cause, but before being dismissed the judge stated: "I think he's trying to get off of jury duty is what I really think." *Id.* A second juror expressed a strong personal opposition to killing, even in self-defense. *Id.* The judge questioned the juror about his ability to follow the law and stated, "You mean you can't follow the law now; is that the idea?" *Id.* On appeal, we held that although the judge made unnecessary and arguably improper comments during voir dire, those remarks did not constitute reversible error because trial judges have broad discretion and a duty to determine whether prospective jurors can remain fair and impartial despite a potential bias. *Id.* at 1039–40. We held that, while the comments were unnecessary, the judge's comments reflected an effort to clarify whether the jurors could set aside those biases and apply the law. *Id.* After reviewing the transcript, this Court noted the record showed prospective jurors continued to candidly disclose potential biases, relationships, and concerns, despite the judge's remarks, and some were excused for cause. *Id.* We cautioned against unnecessary or intemperate comments during voir dire but ultimately concluded the judge's remarks did not interfere with the fair exploration of juror bias or deprive the defendant of an impartial jury. *Id.*

[¶20] As in *Summers*, the trial judge's remarks here were intended to clarify whether the prospective juror could set aside her personal belief that she should not judge others and instead could render a fair and impartial verdict based on the law. The judge's questions sought to resolve any ambiguity regarding the prospective juror's stated bias before excusing her for cause.

[¶21]  At the outset of voir dire, the judge encouraged the jury panel "to be open and responsive during this question-and-answer period." He explained the worst the jurors could do is "to have an answer to one of the[] questions and then just keep it to [themselves]." After the judge questioned the prospective juror about her bias, the jury panel continued to respond to questions and discuss potential biases, including two other jurors who disclosed possible pro-law-enforcement biases based on their personal relationships. As in *Summers*, the record does not show the judge's comments impeded the truth-seeking function of voir dire. Jurors continued to candidly disclose their biases and concerns, and nothing indicates the judge's comments had a chilling effect on the remaining jurors' responses. Mr. Pinegar has not met his burden on appeal. He has not established the judge abused his discretion. [2]

## II.  There is sufficient evidence in the record supporting Mr. Pinegar acted in reckless disregard of the risk of causing evacuation of a building in violation of Wyoming Statute § 6-2-505.

[¶22]  "A person is guilty of a terroristic threat if he threatens to commit any violent felony . . . in reckless disregard of the risk of causing [evacuation of a building]." Wyo. Stat. Ann. § 6-2-505(a); *McCone v. State*, 866 P.2d 740, 750–51 (Wyo. 1993). For his second argument, Mr. Pinegar claims "there is insufficient evidence [showing he] recklessly disregarded the risk that his threats would cause the evacuation of a building as required under [Wyoming Statute] § 6-2-505." He argues the State failed to prove beyond a reasonable doubt he consciously disregarded the risk a building would be evacuated.

[¶23]  Our standard of review for claims challenging the sufficiency of the evidence to sustain a conviction is well established:

> we assume that the State's evidence is true, disregard any evidence favoring the defendant, and give the State the benefit of every favorable inference that may reasonably be drawn from the evidence. After examining the State's evidence, whether direct or circumstantial, we do not substitute our judgment for that of the jury, but instead, we determine whether a jury could have reasonably concluded each of the elements of the crime was proven beyond a reasonable doubt. Furthermore, we defer to the jury as the fact-finder, and assume the jury believed only the evidence adverse to the defendant

---

[2] Appellant contends the applicable standard of review is abuse of discretion, but that structural error applies. Appellee argues plain error applies. Having concluded the judge did not abuse his discretion during voir dire, this Court need not resolve any further dispute about the standard of review. *See generally Gresham*, 708 P.2d at 55–57 (reviewing whether the judge abused his discretion when making comments and asking questions during voir dire under a plain error analysis); *Summers*, 725 P.2d at 1039 (reviewing whether the judge abused his discretion when asking questions and making comments during voir dire).

since they found the defendant guilty beyond a reasonable doubt. Ultimately, our standard of review is not whether the evidence is sufficient for us, but whether, when viewed favorably to the State, it was enough on which a jury could form a reasonable inference of guilt beyond a reasonable doubt.

*Aune v. State*, 2024 WY 137, ¶ 23, 560 P.3d 910, 916 (Wyo. 2024) (quoting *Munoz v. State*, 2024 WY 103, ¶ 8, 556 P. 3d 238, 240, (Wyo. 2024)).

[¶24]  In *McCone v. State*, the defendant was charged and convicted of four counts of making a terroristic threat in violation of Wyoming Statute § 6-2-505 based on four separate phone calls. 866 P.2d at 743–45.  In the first count, the defendant called a healthcare center and asked to speak with an employee. *Id.* at 755.  The witness who answered the call testified the caller said he wanted to speak with the employee and, if she was not put on the phone, he would "come up there and blow [her] expletive head off." *Id.* The defendant hung up the phone before the requested employee could come to the phone. *Id.*

[¶25]  On appeal, the defendant argued there was insufficient evidence showing he acted in reckless disregard of the risk of causing evacuation or serious public inconvenience by making the phone call. *Id.* at 755–56.  This Court rejected that argument and concluded the statement—"get her on the phone [or I will] come up there and blow [your][expletive] head off"—was sufficient for the jury to infer the caller acted in reckless disregard of the risk of causing evacuation of a building. *Id.* (alterations in original).  We held: "Although the threat in [this call] was directed at an individual not at the facility, the risk that the call would likely cause evacuation or similar serious public inconvenience remained substantial[.]" *Id.*  We found the call led to reduced care for residents, a police response, and an uncharacteristic lockdown of the facility. *Id.*  In light of these circumstances, we held the jury could infer that making the call was reckless, and there was sufficient evidence for the jury to convict the defendant of making a terroristic threat based on the phone call alone. *Id.*

[¶26]  Like *McCone*, the testimony here shows the probation office was uncharacteristically locked down and closed, with employees sent home, after Mr. Pinegar made threats directed at an employee.  Based on *McCone*, this would likely be enough to sustain a conviction for making a terroristic threat.  However, Mr. Pinegar's behavior was far more egregious than making one phone call.  The record reflects Mr. Pinegar made multiple escalating threats to the Probation Officer and his family, which ultimately led to the office being evacuated and law enforcement being called.

[¶27]  The Probation Officer supervised Mr. Pinegar for eleven months in 2010, but it was not until approximately ten years later, in early 2020, that Mr. Pinegar began sending daily

9

text messages to the Probation Officer's work phone, claiming the Probation Officer ruined his life and stole his girlfriend. Because of the number of communications, the Probation Officer eventually blocked Mr. Pinegar's phone number. Then on November 5, 2022, Mr. Pinegar called 911 stating to dispatch "[the Probation Officer] is the one that started all this shit." Mr. Pinegar stated the Probation Officer gave his fiancée to his stepdad and created a "f[***]ing war" and Mr. Pinegar's friend stated if he did that to him, he would kill him. Mr. Pinegar stated, "[he] will find [the Probation Officer's] ass, [he] just has to go out there and wait" and also that "[he] needs to talk to him really . . . bad[.]" Mr. Pinegar indicated he wanted the dispatcher to contact the Probation Officer. Toward the end of the call, Mr. Pinegar stated he was "the wrong [person] to do [this] to," and added he was going to fold up his police officer uniform and night vision goggles, and stated he hoped he did not need to use those items, even though he was not a law enforcement officer. A sheriff's deputy notified the Probation Officer about the 911 call, prompting the Probation Officer to review the police report and recording of the 911 call.

[¶28] Less than one month after Mr. Pinegar called 911, two individuals working at the probation office, including the Probation Officer, witnessed Mr. Pinegar walk by the windows outside the office. The Probation Officer testified that when Mr. Pinegar was outside his window, Mr. Pinegar made a gesture with his hand in the shape of a gun. Because Mr. Pinegar's behavior worried the Probation Officer, he left work the rest of the day. He was told by the office manager to report the incident to law enforcement.

[¶29] Two weeks later, on December 14, 2022, Mr. Pinegar began texting the Probation Officer's work phone and sent approximately 65 messages without any response from the Probation Officer in a period of eight hours. At 6:36 a.m., one of Mr. Pinegar's first text messages to the Probation Officer stated, "I'm going to kill you sir. It will only be fair to take your wife. That way you can live with what you did." At 9:27 a.m., Mr. Pinegar messaged the Probation Officer and stated: "You deserve to be shot" and "That's what is going to happen for you." He wrote, "I should get my pistols and go see you right . . . now" and "Now you get to see how a gun is law over any writing[.]" At 12:13 p.m., Mr. Pinegar text messaged the Probation Officer and stated, "I've been investigating you and your family[.] I know exactly what they look like and where they live and work. I wish it didn't come to [t]his but God wants me to punish you for what you did to us." He also messaged: "I'm mad enough to kill you[.] Is that what you wanted? Did you want to make me kill you[?]" "The heart or the head[]?"

[¶30] The Probation Officer interpreted the messages as threats Mr. Pinegar intended to kill him, his wife, and harm his children. The Probation Officer showed the messages to the office secretary, who locked the front door to secure the office and instructed the Probation Officer to notify the office supervisor. Given the content of the messages and Mr. Pinegar's prior conduct in appearing at the office two weeks earlier, the supervisor directed the office to be closed and law enforcement was notified. All employees were directed to leave the office.

[¶31] A person acts in reckless disregard

> when he consciously disregards a substantial and unjustifiable risk that the harm he is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation[.]

Wyo. Stat. Ann. § 6-1-104(a)(ix) (2021). Based on his actions and messages in November and December 2022, the testimony supports the jury's verdict that Mr. Pinegar consciously disregarded a substantial and unjustifiable risk of causing the evacuation of the probation office on December 14, 2022. Mr. Pinegar's actions in calling dispatch and threatening the Probation Officer, showing up to the probation office and making a hand gesture of a gun, and texting the Probation Officer that he was going to kill him and harm his family was sufficient for a jury to infer Mr. Pinegar acted in "reckless disregard of the risk of causing evacuation." *See McCone*, 866 P.2d at 755–56.

## CONCLUSION

[¶32] The trial judge did not commit misconduct by inquiring into the prospective juror's admitted bias during voir dire. The judge had a duty to inquire into the alleged bias and determine whether the prospective juror could render a fair and impartial verdict despite that bias. The State presented sufficient evidence to support Mr. Pinegar's conviction for making a terroristic threat by showing he recklessly disregarded the risk of causing evacuation of a building when he called dispatch and threatened the Probation Officer, showed up to the probation office making a hand gesture in the shape of a gun, and sent threatening messages to his former Probation Officer. Affirmed.

11